Mary G. **KIRKPATRICK**, Esq., Legal Guardian for Jane Doe I, and Mary **Kehoe**, Esq., Legal Guardian for Jane Doe II, Plaintiffs,

v.

**MERIT BEHAVIORAL CARE CORPORATION dba Merit Behavioral Care Systems Corporation, Defendant.**

No. 2:97–CV–203.

United States District Court,
D. Vermont.

Dec. 20, 2000.

---

Richard Thomas Cassidy, Hoff, Curtis, Pacht, Cassidy & Frame, P.C., Burlington, VT, Bryant Welch, Bryant L. Welch, J.D., Ph.D. & Associates, Potomac, MD, for Mary G. Kirkpatrick, Legal Guardian for Jane Doe I nfr Jane Doe, I, Mary Kehoe, Legal Guardian for Jane Doe II nfr Jane Doe, II, plaintiffs.

Peter B. Joslin, Jeffry W. White, Theriault & Joslin, Montpelier, VT, Jeffrey J. Bouslog, Oppenheimer, Wolff & Donnelly LLP, St. Paul, MN, for Merit Behavioral Care Corporation dba Merit Behavioral Care Systems Corporation, defendants.

## OPINION AND ORDER

SESSIONS, District Judge.

Plaintiffs in this lawsuit against Defendant Merit Behavioral Care Corporation ("Merit"), a managed behavioral health organization, have moved pursuant to Fed. R.Civ.P. 59(e) to vacate this Court's opinion filed May 19, 2000 which granted summary judgment to Merit and closed the case. For the reasons that follow, Plaintiffs' motions (papers 167 and 168) are granted. The May 19 opinion (paper 165) is vacated.

### I. Factual Background

Jane Doe I and Jane Doe II are two young women who have suffered from psychiatric illnesses. They have alleged that Merit denied them necessary mental health treatment, causing each of them to suffer severe deterioration in their conditions, culminating in near fatal suicide attempts.

In 1995 Jane Doe I, then sixteen years old, was covered under her mother's health insurance, the State of Vermont Employee Medical Benefit Plan, also known as "Choice Plus." Choice Plus provided three types of benefits for its participants: inpatient hospital benefits, regular benefits, and special benefits. Mental health and substance abuse benefits, both outpatient and in-patient, were classified as special benefits. The mental health outpatient benefit covered expenses for treatment of mental and nervous disorders. The in-patient benefit included both hospital and non-hospital based programs. Non-hospital based programs included confinement in an approved residential treatment center, subject to a lifetime maximum of 56 days per person.

Choice Plus required that all in-patient mental health or substance abuse benefits be "pre-certified" by its mental health managed care provider. The pre-admission certification procedure entailed a professional review by the mental health managed care provider to determine before admission the number of days of in-patient care which would be deemed medically necessary for the care or treatment of the condition.

Pursuant to a collective bargaining agreement between the State of Vermont ("the State") and the Vermont State Employees' Association, the State contracted with Merit to provide mental health and substance abuse benefits for its Choice Plus participants. Under the terms of its contract with the State, Merit agreed to establish a network of care providers for both outpatient and in-patient services, to provide case management services, and to make all determinations of medical necessity for care or treatment.

Beginning in 1994, Merit's arrangement with the State became a capitated contract; in other words, Merit received a set fee per covered employee per month for its services, and assumed all financial risk. If the cost of care Merit authorized exceeded the fee it collected, Merit lost money. If

Merit authorized less than the amount it received, Merit pocketed the excess over a minimum amount the contract required to be expended. Merit essentially offered itself to the State and to its covered employees as a complete system of mental health and substance abuse services.

In 1995, Jane Doe II, then eighteen years old, was covered under her mother's health insurance, the Vermont Education Health Initiative Vermont Health Partnership ("the VHP Plan"), administered by Blue Cross Blue Shield of Vermont ("BCBS–VT"). The VHP Plan operated a managed benefit program, which covered, among other benefits, mental health and substance abuse services. The Plan required a participant to obtain prior approval from BCBS–VT or its designated agent for all mental health and for all substance abuse services, and to receive care from network mental health or substance abuse providers.

Merit and BCBS–VT entered into a capitated agreement similar to the one between Merit and the State, whereby Merit would provide a network of mental health care professionals and facilities and would conduct pre-approval determinations of medical necessity for covered services. It also provided case management services and managed the network of mental health care providers. Merit offered a complete system of mental health care to BCBS–VT and to the covered members of the VHP Plan.

Such an arrangement to provide and pay for managed behavioral health care separately from other health services has been termed a mental health carve-out contract.

## II. *Procedural Background*

Plaintiffs Mary G. Kirkpatrick, Esq. and Mary Kehoe, Esq. filed this complaint on behalf of their wards, Jane Doe I and Jane Doe II on June 27, 1997, alleging tortious conduct in Merit's provision of mental health services. The one count of the complaint is captioned "Tortious Breach of Contract." Within this count Plaintiffs alleged breach of a common law duty not to injure them by unreasonably denying coverage, breach of a duty not to injure them arising out of state law governing insurance for mental health care services, and breach of a fiduciary obligation not to threaten to withhold or actually to withhold payment for treatment. In wrongfully denying them benefits, Plaintiffs further alleged that Merit interfered with a protected relationship between patient and health care provider, and "intentionally inflicted emotional stress [sic] upon [them]." Compl. ¶ 69. In the body of the complaint Plaintiffs also alluded to intentional, willful and reckless breach of a duty to provide medically necessary mental health treatment by concealing the extent of coverage and benefits available and rejecting bona fide medical claims. Compl. ¶ 35, 50, 51.

In February 1999 Merit filed a "Motion for Summary Judgment: Bad Faith" (paper 65) in which it claimed entitlement to summary judgment on all claims presented by both plaintiffs because a reasonable basis existed for Merit's activities. Merit stated that Plaintiffs had solely asserted claims for tortious breach of contract (" ... Plaintiffs' theory against MBC is one of 'first party bad faith' presented under a single count entitled 'Tortious Breach of Contract.' "). Def.'s Mem. in Supp. of Summ. J.—Bad Faith at 5–6 (paper 66). In their responsive briefing, hardly a model of clarity, Plaintiffs neither accepted nor rejected this characterization of their claims, arguing primarily that Merit's evidence of reasonable basis would be inadmissible at trial. On November 3, 1999, the Court denied Merit's motion, ruling that disputed issues of fact precluded summary judgment "with regard to Plaintiffs' bad faith claims." Order and Mem. at 6 (paper 120).

At an April 28, 1999 scheduling conference the plaintiffs indicated they intended to file a motion for partial summary judgment on whether a contract had been breached, and were given a deadline by

which to file it. The deadline was extended once, but the plaintiffs filed their motion more than one month later than the extended deadline, and the Court granted Merit's motion to strike the motion on November 9, 1999.

On December 3, 1999 the Court held a status conference and addressed pending motions. In the context of Merit's motion to reconsider the denial of its motion for summary judgment on the bad faith claim, Plaintiffs' attorney[1] stated that the complaint asserted bases for liability in addition to a first party bad faith claim. In other remarks however, he appeared to suggest that unless he could establish a breach of contract he would have no case.

On December 29, 1999 Merit moved to dismiss the complaint in its entirety, as a sanction for Plaintiffs' failure to file their motion for partial summary judgment by the court-extended deadline (paper 143). It proceeded to cross move for summary judgment in response to the motion for partial summary judgment which it had so recently successfully stricken from the record. Def.'s Omnibus Br. at 1 (paper 151). The Court heard argument on May 2, 2000, and, inter alia, sought clarification on the plaintiffs' theories of the case. It understood Plaintiffs' attorney to be asserting two principal theories, one a bad faith breach of contract, the other the breach of a duty of care.

In its Order and Opinion filed May 19, 2000, the Court dismissed the case in its entirety, ruling that Plaintiffs could not establish the existence of contracts between themselves and Merit, and therefore could not establish breach of such contracts, in bad faith or otherwise (paper 165). It did not address any other claims which arguably were presented by the complaint or asserted by Plaintiffs' attorney. Plaintiffs have now requested reconsideration of the decision, pursuant to Rule 59(e) of the Federal Rules of Civil Procedure.

## III. *Discussion*

### A. *Rule 59(e)*

"It is well-settled that Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple.'" *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir.1998). Rule 59(e) makes it clear, however, that a "district court possesses the power to rectify its own mistakes in the period immediately following the entry of judgment." *White v. New Hampshire Dept. of Employment Sec.*, 455 U.S. 445, 450, 102 S.Ct. 1162, 71 L.Ed.2d 325 (1982) (internal quotation mark omitted); *see Greene v. Town of Blooming Grove*, 935 F.2d 507, 512 (2d Cir.1991).

It now appears to the Court that it erred in granting summary judgment to Merit; the Court overlooked the existence of other theories of recovery that were pled in the complaint and which Merit did not address in its motions for summary judgment. Furthermore, the Court erred in ruling that Plaintiffs' bad faith breach of contract claim could not survive summary judgment.

Recognizing the age of this case, and the importance of the issues to all parties, the Court does not lightly undertake this exercise of its discretion. Reconsideration of a judgment after its entry is indeed "an extraordinary remedy which should be used sparingly." 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2810.1 (2d ed.1995). Nevertheless, the Court believes this case requires such a remedy, in order to correct manifest errors of law and of fact upon which the judgment was based. *See id. See also, FDIC v. World Univ. Inc.*, 978 F.2d 10, 16 (1st Cir.1992) (Rule 59(e) motion must either clearly establish manifest error of law or present newly discovered evidence); *Atlantic States Legal Found., Inc. v. Karg Bros.*, 841

---

**1.** Plaintiffs' attorney at the time has since    withdrawn from the case.

F.Supp. 51, 53 (N.D.N.Y.1993) (reconsideration justified if necessary to remedy a clear error of law).

### B. *Alternative theories of recovery*

Plaintiffs have argued that their complaint alleged, in addition to tortious breach of contract, the following additional causes of action: 1) tortious interference with a business relationship between doctor and patient; 2) tortious interference with a contract between Plaintiffs and their parents' employers for the receipt of mental health care and benefits; 3) intentional infliction of emotional distress; 4) negligent making of health care decisions. The Court agrees that these causes of action can be inferred from the allegations in the complaint.

■ Under the federal system of "notice" pleading, a complaint does not have to set forth the specific legal theory or theories justifying the relief sought, but need only set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a); *See also Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 600 (2d Cir. 1991) (federal pleading is by statement of claim, not by legal theory); *Gins v. Mauser Plumbing Supply Co.*, 148 F.2d 974, 976 (2d Cir.1945) (particular legal theories of counsel yield to court's duty to grant relief to which prevailing party is entitled, whether demanded or not). The legal theories upon which a plaintiff will rely at trial may be developed during the discovery process, refined at pretrial conferences, and tested by motion for summary judgment. *See* Fed.R.Civ.P. 33(c); 36(a); 16(c)(1); 56.

■ The fact that Plaintiffs created a single count complaint captioned "tortious breach of contract" thus does not prevent their recovery on a different legal theory if recovery is warranted. Despite a lengthy period of pre-trial discovery however,

Plaintiffs never fleshed out, nor did Merit (perhaps understandably) move for summary judgment on these additional legal theories, although at various hearings and in various briefings Plaintiffs alluded cryptically to them. Consequently, although these are not new theories, Merit has not had an adequate opportunity to address their legal sufficiency in advance of trial. *See* 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1219 (2d ed.1990) (party with valid claim should recover regardless of counsel's failure to perceive its true basis at pleading stage, provided that late shift in thrust of case will not prejudice other party).

Accordingly, the Court directs that Plaintiffs file a statement that specifies each of their theories of recovery and the facts which support each theory within ten days of the date of this opinion. An amended complaint will satisfy this directive, if it is specific enough to give notice to the Court and to Merit of the issues of law in contention. Within thirty days of the filing of Plaintiffs' statement or amended complaint, Merit may move for summary judgment on any theory presented which has not previously been addressed.

### C. *Bad–Faith Failure of Insurer to Pay First–Party Claim*

■ Merit consistently cast Plaintiffs' complaint as alleging a first-party bad-faith insurance cause of action, first recognized in Vermont in *Bushey v. Allstate Ins. Co.*, 164 Vt. 399, 670 A.2d 807 (1995).[2] To establish such a cause of action, "a plaintiff must show that (1) the insurance company had no reasonable basis to deny benefits of the policy, and (2) the company knew or recklessly disregarded the fact that no reasonable basis existed for denying the claim." *Id.*, 164 Vt. at 402, 670 A.2d at 809. Obviously the cause of action also requires an insurer-insured relationship. *See id.* Merit attacked this claim on

---

**2.** In this diversity case, this Court applies the substantive law of the state of Vermont. *See*

*Erie R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

two grounds, first, that Plaintiffs could not establish "no reasonable basis," and second, that Plaintiffs could not establish the existence of a contract between them and Merit. The Court denied summary judgment on the first ground, but granted it on the second. Upon reconsideration of the grant of summary judgment, the Court concludes that it accepted too narrow a reading of *Bushey,* and too limited a description of Merit's role in the provision of mental health care benefits.

■ The Court found that the Plaintiffs failed to show that a contract existed between them and Merit. The written contracts in this case run between the State and Jane Doe I, BCBS–VT and Jane Doe II, the State and Merit, and BCBS–VT and Merit. But *Bushey* does not predicate bad faith refusal to pay a claim on the existence of a written contract of insurance between a plaintiff and a defendant; it requires the existence of an insurer-insured relationship between them. *See id.* The question is whether Merit is entitled to summary judgment on the issue of whether it stood in the relationship of an insurer with regard to Plaintiffs. Construing the facts in the light most favorable to and drawing all reasonable inferences in favor of Plaintiffs as the nonmoving parties, *see Shapiro v. Berkshire Life Ins. Co.,* 212 F.3d 121, 124 (2d Cir.2000), Merit has not demonstrated that it is not an insurer.

In 1995, "health insurer" was defined in Section 9402(5) of Title 18, Vermont Statutes Annotated as "any health insurance company, nonprofit hospital and medical service corporation, health maintenance organization, and, to the extent permitted under federal law, any administrator of an insured, self-insured, or publicly funded health care benefit plan offered by public and private entities." Vt. Stat. Ann. tit. 18, § 9402(5) (Supp.1995).[3] Merit admits

that the State (in the case of Jane Doe I) and BCBS–VT (in the case of Jane Doe II) contracted with Merit to administer the mental health care component of their services. Def.'s Opp'n to Pls.' Supplemental Mot. to Reconsider at 3–4 (paper 177). That would appear to place Merit squarely in the position of an insurer, at least as far as the Vermont state legislature and the state's Department of Banking, Insurance, Securities, and Health Care Administration are concerned.

■ In *Abbiati v. Buttura & Sons, Inc.,* 161 Vt. 314, 318, 639 A.2d 988, 991 (1994), the Vermont Supreme Court held that no contractual relationship arises between an insured employee and her employer's insurance company where the employee contributes nothing to the payment of the premiums. It noted that "some courts have held that there is a contractual relationship between the insured employees and the insurer, often created when the employee contributes to premium payment." *Id.,* 161 Vt. at 318, 639 A.2d at 990. The Vermont Supreme Court has not had occasion to decide whether a contractual relationship would arise between insurer and employee in a case such as the one at bar, where a certificate or policy is issued to the employee and the employee pays a portion of the premium. Where state law is uncertain, a federal court's role is to " 'carefully ... predict' how the state's highest court would resolve the uncertainty." *Maska U.S., Inc. v. Kansa Gen. Ins. Co.,* 198 F.3d 74, 78 (2d Cir.1999) (ellipsis in original) (quoting *Travelers Ins. Co. v. 633 Third Associates,* 14 F.3d 114, 119 (2d Cir.1994)).

In *Abbiati,* the Vermont Supreme Court adopted the holding of *Watson v. Pilot Life Insurance Co.,* a decision from the Tennessee Court of Appeals. *Watson v. Pilot Life Ins. Co.,* 741 S.W.2d 342, 343–44

---

**3.** "Health insurer" is currently defined as "any health insurance company, nonprofit hospital and medical service corporation, *managed care organizations,* and to the extent permitted under federal law, any administra-

tor of an insured, self-insured, or publicly funded health care benefit plan offered by public and private entities." Vt. Stat. Ann. tit. 18, § 9402(7) (Supp.2000) (emphasis supplied).

(Tenn.Ct.App.1987). Tennessee case law has long held that when an employee contributes part of the premium and is issued a certificate by the insurer, there is a contractual relationship between the employee and the insurer. *See Smithart v. John Hancock Mut. Life Ins. Co.*, 167 Tenn. 513, 71 S.W.2d 1059, 1064 (1934). *See also Watson, id.*, at 343. This Court predicts that the Vermont Supreme Court, if faced with this issue, would conclude that employee contribution gives rise to a contractual relationship between insured employee and insurer, given its approval of the reasoning in *Watson*.

Merit protests that whether or not it can be deemed an insurer under Vermont law, and whether or not Plaintiffs have contractual relationships with their insurers because their parents paid a portion of the insurance premiums, Plaintiffs do not have contractual relationships with Merit. Merit is not Plaintiffs' insurer, it claims, because Merit collects a capitated fee from the State and BCBS–VT, instead of collecting a portion of Plaintiffs' parents' payroll contributions. To accord such a distinction the power to determine whether a managed care organization is an insurer of the patients for whom it provides services would be to ignore the realities of modern health insurance coverage.

Currently, more than 165 million people are enrolled in managed care plans nationwide. *See Managed Care National Statistics* (visited Dec. 5, 2000) <http://www.mcareol.com/factshsts/factnati.html>. More than a quarter of Vermont's population has managed care health coverage. *See* MDI Online, *Managed Care Profile Map: Vermont* (visited Dec. 5, 2000) <http://www.medicaldata.com/ MCMap/mcpm.asp?PID=MAP-VT & S= Vermont>. Most individuals who receive group insurance through their employers are enrolled in one of three types of managed care plans, a health maintenance organization, a preferred provider organization, or a point-of-service plan. *See* American Ass'n of Health Plans, *Health Plans and Employer–Sponsored Plans* (visited Dec. 5, 2000) <http://www.aahp.org>.

There are a welter of managed care financial structures. *See* E.H. Morreim, *Confusion in the Courts: Managed Care Financial Structures and Their Impact on Medical Care*, 35 Tort & Ins. L.J. 699, 699–700 (2000); Alice A. Noble & Troyen A. Brennan, *The Stages of Managed Care Regulation: Developing Better Rules*, 24 J. Health Pol. Pol'y & L. 1275, 1287–88 (1999); Julie J. Welch, *Managed Care: The Dominant Paradigm in U.S. Healthcare*, J. of AHIMA, Apr. 1998. Recently, mental health "carve-outs," or managed behavioral health organizations, have become a significant feature of the provision of mental health services. It has been estimated that approximately half of insured individuals receive mental health insurance coverage from a mental health carve-out. *See* Gary Mihalik & Michael Scherer, *Fundamental Mechanisms of Managed Behavioral Health Care*, 24 J. Health Care Fin. 1, 1 (1998), referenced in Jesse A. Goldner, *Managed Care and Mental Health: Clinical Perspectives and Legal Realities*, 35 Hous. L.Rev. 1437, 1448–49 (1999). Carve-out organizations contract with employers directly, with other insurers, with hospitals or with other managed care plans. *See id.; United States v. Long Island Jewish Med. Ctr.*, 983 F.Supp. 121, 142 (E.D.N.Y.1997).

Merit contracted with an employer (the State) in the case of Jane Doe I and with an insurer (BCBS–VT) in the case of Jane Doe II. It undertook in both cases to provide a full range of mental health services for a per person, per month (capitated) fee, to bear the entire financial responsibility for those services, and to make all the decisions regarding the medical necessity for those services. Merit has offered no logical reason why a fee for service payment arrangement could give rise to an insured insurer relationship, but a capitated fee arrangement could not.

Upon reconsideration of this Court's disposition of Merit's request for summary judgment, summary judgment is denied because Merit is unable to show the absence of an insured-insurer relationship between itself and Plaintiffs.

## IV. Third Party Rights Clause

■ The Court in its May 19 decision failed to address directly Plaintiffs' argument that the provision in the State's contract with Merit which explicitly denied creating third party rights[4] was void as against public policy. Upon reconsideration, however, the Court reaches the conclusion that the provision is not void as against the public policy of the state of Vermont, and is enforceable as written.

■ Whether a contract confers third party beneficiary rights depends on the intention of the original contracting parties. See Morrisville Lumber Co. v. Okcuoglu, 148 Vt. 180, 184, 531 A.2d 887, 890 (1987). Merit and the State unmistakably intended not to create third party rights, and explicitly excluded plan beneficiaries such as Plaintiffs from having any enforceable rights under their contract.

■ A federal court sitting in diversity is not free to develop its own notion of what a state's public policy is or should be; it must look to state law for guidance. See Maska U.S., 198 F.3d at 80 (quoting Cornellier v. American Cas. Co., 389 F.2d 641, 644 (2d Cir.1968)). In Vermont, contracts are "not illegal and void as being against public policy unless it [can] be said that they [are] injurious to the interests of the public or contravene[ ] some established interest of society." State v. Barnett, 110 Vt. 221, 232, 3 A.2d 521, 526 (1939). See also Maska, id. Moreover, "a court's power to invalidate contractual provisions as offensive to public policy is not exercised in every case in which the contract may seem to operate harshly." Cornellier, id.

Plaintiffs argue that the Restatement (Second) of Contracts § 302, comment (d) provides that public policy considerations can override the parties' intentions as stated in their contract. While this may be true as a general principle, Plaintiffs have not offered any support from constitution, statute or case law in Vermont for their argument that Vermont's public policy justifies overriding a clear contractual provision precluding creation of third party rights. Nor has the Court been directed to authority refusing to enforce such a provision in other jurisdictions.

Plaintiffs stress that managed care companies currently wield tremendous power over the quality of health care that people receive, and that the state's public policy concern for health care warrants greater accountability for these entities. Again, this may be true as a general principle, but it does not necessarily follow that Vermont would conclude that the path to greater accountability lies in permitting insureds to sue on the agreements between managed care companies and the insureds' employers. In the absence of any indication that a Vermont court would invalidate this provision, this Court finds no basis for holding that the contractual preclusion of third party rights is void as against public policy.

## V. Conclusion

For the reasons stated above, Jane Doe I's F.R.Civ.P. 59(e) Motion to Amend Judgment (paper 167) and Jane Doe II's Motion for reconsideration and for Leave to Supplement (paper 168) are **Granted.** The Court's Order and Opinion (paper 165) is Vacated. Merit's Motion to Strike Plaintiffs' Supplemental Motion to Reconsider (paper 171) is **Denied.** Plaintiffs

---

4. The full text of the contractual provision is as follows:

   *THIRD PARTY RIGHTS*

   The parties have not created and do not intend to create by this Contract any enforceable rights in any third party under this Contract, including, but without limitation, Covered Members. The parties acknowledge and agree that there are no third party beneficiaries to this Contract.

shall file their statement or amended complaint within ten days of the date of this opinion. Merit shall file any additional motion for summary judgment within thirty days of Plaintiffs' filing. All pending motions that were denied as moot by the May 19 order remain **Denied.**