274 B.R. 351 (2002)
In re Robert GORMAN, Debtor.
Robert Gorman, Plaintiff,
v.
Marcon Capital Corp. and Todd Enright, Defendants.
Marcon Capital Corp., Plaintiff,
v.
Robert Gorman, Defendant.
Bankruptcy No. 98-10293fgc. No. 2:98-cv-301. Adversary Nos. 98-1046, 98-1072.
United States District Court, D. Vermont.
February 7, 2002.
*352 *353 John Paul Faignant, Miller, Faignant & Behrens, P.C., James Patrick Carroll, *354 Keyser Crowley, P.C., Rutland, VT, for Robert Gorman.
Robert Francis O'Neill, Gravel and Shea, Burlington, VT, for Marcon Capital Corporation, Todd Enright.

OPINION AND ORDER
SESSIONS, District Judge.
Marcon Capital Corp. ("Marcon") sued Robert Gorman ("Gorman") in Vermont state court alleging breach of a financing agreement and received an attachment on Gorman's real property. Subsequently Gorman filed for bankruptcy and brought suit against Marcon and Todd Enright ("Enright"), one of its principals, claiming breach of contract, fraud, negligence in lending, intentional infliction of emotional distress, tortious breach of the duty of good faith and fair dealing, and tortious interference with contractual relationships. This Court withdrew the reference of both proceedings to Bankruptcy Court for the District of Vermont and consolidated the cases in this Court for trial. Gorman has filed for partial summary judgment on his breach of contract claim[1] against Marcon, based on Marcon's alleged violation of the Vermont Licensed Lender Act (Paper 50). Marcon has also filed for summary judgment in its breach of contract action against Gorman (Paper 55). For the reasons discussed below, the Court GRANTS in part and DENIES in part Gorman's motion for partial summary judgment and GRANTS in part and DENIES in part Marcon's motion for summary judgment.
I. BACKGROUND
The following facts are undisputed. In 1997 Gorman was the proprietor of Green River Rodmakers ("GRR"), a Vermont business engaged in crafting and selling fly-fishing rods. At that time Gorman was in need of capital for use by GRR. In order to procure such capital he posted notices on the Internet and an advertisement in the New York Times. Gorman received a telephone response from Marcon through Enright in April 1997. Marcon is a Connecticut corporation that provides emerging small businesses with financing and capital. Marcon is a federal licensee under the Small Business Investment Act of 1958. Enright is a vice-president of Marcon and a resident of Hinsdale, New Hampshire.
Shortly after speaking with Enright, Gorman met with Enright and Robert Mahoney, also a vice-president of Marcon. During that meeting Marcon requested additional financial data on GRR which Gorman delivered the following week.
On June 18, 1997 Gorman executed and returned to Marcon a form entitled "Request and Application for Capital for Green River Rodmakers." (Paper 53, Ex. A). In early July 1997, Marcon provided Gorman with a preliminary agreement proposing terms for financing (a "term sheet agreement"). (Paper 53, Ex. B).
Several days later Gorman met with Enright. During this meeting Gorman indicated that GRR was behind on the payment of two loans. Shortly thereafter, in the middle of July 1997, Marcon provided Gorman with a revised term sheet agreement, which Enright and Gorman then discussed. On September 8, 1997 Gorman signed a second revised term sheet agreement. *355 Included with the signed term sheet agreement was a rider in which Gorman added additional terms.
In the term sheet agreement signed by Gorman, Marcon proposed providing total financing of $300,000 for use by GRR. It identified GRR as "a corporation to be organized under the laws of the State of Vermont with its principal place of business in Brattleboro, Vermont 05301." Term Sheet Agreement ¶ 1. The financing was to "be used to repay existing obligations owed by Robert Gorman, d/b/a Green River Rodmakers, to The First Vermont Bank and Trust Company." Term Sheet Agreement ¶ 12.
The first $50,000 of the financing was to be provided through a debenture purchase agreement.[2] Term Sheet Agreement ¶ 3(a). An additional $250,000 was to be advanced according to a loan agreement. Term Sheet Agreement ¶ 3(b). The term sheet agreement detailed the interest payments and collateral required for the debenture purchase and loan agreements, the date of closing for both, Gorman's prepayment rights, and various conditions precedent to the closings. Term Sheet Agreement ¶¶ 6, 7, 11, 13, 15. It required Gorman to pay a break-up fee of $15,000 if he failed to close with Marcon because he had arranged any portion of the $300,000 through another source. Term Sheet Agreement ¶ 18. Gorman was also required to reimburse Marcon for legal fees and other expenses incurred by Marcon in connection with the transaction. Term Sheet Agreement ¶ 19. Finally, the term sheet agreement contained the following disclosure in bold upper case lettering above the signature line:
This term sheet is intended for use only as the basis for continued discussions between GRR and [Marcon], and does not constitute an agreement, commitment, contract or an offer to enter into an agreement or contract and shall not be deemed to obligate [Marcon] in any manner whatsoever. . . . [3]
Enright contacted Gorman a few days later and the two discussed the closing of the financing agreements between Marcon and GRR. On or about September 13, 1997 Enright called Gorman and stated that the closing would occur in Connecticut. At some point in September Marcon provided Gorman's attorney with a letter "intended to confirm certain circumstances in connection with the proposed loan by [Marcon] to [Gorman]." Draft Letter from Gorman to Enright of 9/97 ("Enright Letter") at 1 (Paper 53, Ex. C). The letter was to be signed by Gorman and addressed to Enright. The letter addressed Gorman's solicitation of financing and Marcon's initial phone contact with Gorman. It also included a statement to be made by Gorman that "[a]lthough Marcon has conducted various due diligence investigations and meetings with [GRR] in Vermont, [GRR] understands and agrees that Marcon's making of loans to it does not constitute the conduct of business in Vermont by Marcon." Id. at 2.
Subsequently, at Gorman's request, Marcon provided Gorman $3000 for expenses associated with a trade show he *356 planned to attend. Upon his return from the trade show, Gorman again met with Enright and the two discussed a "lockbox" provision[4] Marcon had included in the financing agreements that would be signed at closing. Enright informed Gorman that the lockbox provision was a standard provision included in financing contracts. Gorman then stated that he would not sign the loan agreement. On October 17, 1997, Marcon obtained a writ of attachment for $22,562.18 on Gorman's real property in Brattleboro, Vermont. Marcon Capital Corp. v. Gorman, No. 2:XXX-XX-XX Wmc (Vt.Sup.Ct. Oct. 17, 1997) (Order of Approval for Non-Possessory Writ of Attachment). The total attachment amount is based on Marcon's claim for $3,500 in expenses and $4,062.18 in legal fees associated with the transaction, as well as the $15,000 break-up fee. Enright Aff. ¶¶ 7, 9, 10 (Paper 51).
At the time Marcon became acquainted with Gorman, and throughout all of these events, Marcon did not hold a license to lend in Vermont. During all of these events Marcon was also aware of the licensing requirement for lenders. Enright Aff. ¶ 3 (Paper 53). At some point during these events, Marcon had applied to the Vermont Banking, Insurance, Securities, and Health Care Administration (hereinafter "BISHCA") for a license to lend. However, Marcon's application was rejected on the basis that Marcon did not meet the requirement that "the financial responsibility, experience, character, and general fitness of [Marcon] are such to command the confidence of the community and warrant the belief that the business will operate honestly, fairly, and efficiently within the purposes" of Title 8, Chapter 73 of the Vermont Statutes. Defs.' Resp. to Reqs. to Admit and Related Interrog. (hereinafter "Defs.' Resp. to Interrog.") at 2 (Paper 51).
II. SUMMARY JUDGMENT STANDARD
Summary judgment should be granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering two opposing motions for summary judgment, the Court follows the same standard and need not grant either side's motion. Schwabenbauer v. Bd. of Educ., 667 F.2d 305, 313-314 (2d Cir.1981).
A fact is material when it affects the outcome of the suit under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue as to a material fact exists when the evidence requires a factfinder to resolve the parties' differing versions of the truth at trial. Id. at 249, 106 S.Ct. 2505 (citing First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). The moving party has the initial burden of coming forward with those parts of the record it feels demonstrate an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party must then "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). When evaluating a motion for summary judgment, the court is required to view the evidence in the light most favorable to the nonmoving party. Dister v. Cont'l Group, Inc., 859 F.2d 1108, 1114 (2d Cir.1988).
*357 III. DISCUSSION
A. The Licensed Lender Act
The Vermont Licensed Lender Act (the "LLA") provides that "[n]o person shall without first obtaining a license under this chapter . . . (1) engage in the business of making loans of money, [or] . . . contract for or receive on any such loan interest, a finance charge, discount or consideration therefor[.]" Vt. Stat. Ann. tit. 8, § 2201(a)(1) (Lexis Supp.2001). The policy underlying Vermont's banking and insurance regulation, including the LLA, is to ensure, inter alia, that the "business of organizations that offer financial services and products . . . shall be supervised in such a way as to protect consumers against unfair and unconscionable practices and to provide consumer education." Vt. Stat. Ann. tit. 8, § 1 (Lexis Supp.2001).
All licensees under the LLA are required to file with the commissioner of BISHCA a bond to be used to pay to the state and other persons any moneys owed by virtue of the provisions of the LLA. Vt. Stat. Ann. tit. 8, § 2203(a) (Lexis Supp.2001). In addition, a licensee is required to prove that it has sufficient liquid assets for the operation of its proposed lending business. § 2203(b). BISHCA is permitted to grant a license only if it finds, inter alia, that the lender will operate its business "honestly, fairly, and efficiently within the purposes" of the LLA and that the lender's "business will promote the convenience and advantage of the community" in which it is located. § 2204(a)(1),(2).
Under the LLA, "[a]ny contract of loan" knowingly and willfully made in violation of the licensing requirement of section 2201(a) is void and the lender is prohibited from collecting any principal, interest, or charges. Vt. Stat. Ann. tit. 8, § 2215(c)(1) (Lexis Supp.2001). If the violation is not knowing and willful, the lender is prohibited from collecting interest and charges but may collect the principal. Id.
B. Gorman's Summary Judgment Motion
Gorman asks the Court to find the contract made between Marcon and himself void under § 2215(c)(1) because Marcon did not have a license to lend money at the time the negotiations occurred and the contract was executed. Alternatively Gorman asks the court to find the term sheet agreement void as against public policy because the term sheet agreement made by an unlicensed lender in violation of the LLA. Marcon argues that the transaction is not covered by the LLA because Marcon did not "engage in the business of making loans." Even if the transaction is covered by the LLA, Marcon argues that the term sheet agreement is not void under the LLA because Marcon did not enter into a "contract of loan" with Gorman.
The first question that must be addressed is whether Marcon "engaged in the business of making loans" through its interactions with Gorman. The answer is clearly yes. It is difficult to fathom how Marcon's dealings with Gorman are not within the plain meaning of "engaging in the business of making loans." In fact, even though the closing did not occur, Marcon provided Gorman with $3000 in advance of the anticipated closing.
Moreover, from Marcon's first phone call to Gorman through its provision of the proposed closing documents, Marcon was actively pursuing a financing arrangement in which it would loan Gorman money. Marcon's line of work, its business, involved providing funding to ventures such as Gorman's. Styling the interactions between Gorman and Marcon as merely an investigation into the advisability of loaning money to Gorman does not change the fact that these dealings were undertaken *358 pursuant to both parties' interest in entering into a arrangement for the loan of money. No doubt most lenders would undertake the same investigatory steps and negotiations prior to providing the borrower with a promissory note. It is simply part of the business of being a money-lender.
The second question is whether Marcon was subject to the licensing requirement of the LLA when it engaged in the business of making loans. It is undisputed that Marcon did not have a license during its interactions with Gorman. There is no allegation or evidence that Marcon would fit into any of the limited exceptions to the licensing requirement of section 2201(a). Cf. In re Burke Mountain Recreation, Inc., 64 B.R. 799, 802-03 (Bankr.D.Vt.1986) (finding a development credit corporation not included within the enumerated exceptions to coverage under the LLA). Accordingly, Marcon was subject to the licensing requirement.
Marcon argues that its dealings with Gorman do not constitute a violation of the LLA because Marcon did not solicit Gorman and because the closing for the loan would have occurred outside of Vermont. The LLA "seeks to regulate both in-state and out-of-state lenders," Green Tree Credit Corp. v. Kenyon, 163 Vt. 631, 633, 660 A.2d 296 (1995), however, it provides a limited exemption for "out-of-state" loans.
Specifically, section 2238 exempts out-of-state commercial loans.[5] It defines "out-of-state" loans as those commercial loans "made to a borrower located outside of Vermont for use outside of Vermont." See also Vt. Stat. Ann. tit. 8, § 2228 (Lexis Supp.2001) (usury provision similarly defining out-of-state loans). At the same time, section 2233(b) provides that "[a] loan solicited and made by mail, telephone or electronic means to a Vermont resident shall be subject to the provisions of this chapter notwithstanding where the loan was legally made." Thus, a lender need not physically enter Vermont in order to be subject to the licensing requirement. These provisions create the endpoints delineating the range of lending activity considered "in-state" for purposes of the LLA. Together they indicate that the Legislature intended the LLA to cover a broad spectrum of lending activity involving Vermont residents.
In this case it is clear that the loan proceeds were to be used in Vermont. The term sheet agreement provided that the proceeds were to be used by GRR, a Vermont company with its principal place of business in Vermont, for use in paying off debts owed to a Vermont bank. In addition, the loan negotiations occurred in Vermont. The letter drafted by Marcon and attached by Marcon to Enright's affidavit states that Marcon "has conducted various due diligence investigations and meetings with [GRR] in Vermont." Enright Letter at 2 (Paper 53, Ex. C).[6] The location of a closing which never even occurred is irrelevant. Similarly, that Gorman may have initially solicited the loans via his postings and advertisements does not negate the fact that Marcon then contacted Gorman to discuss providing financing to Gorman.
*359 Because Marcon engaged in the business of loaning money in Vermont without a license, it violated the LLA. Section 2215(c)(1) makes void any "contract of loan" made by an unlicensed lender in knowing and willful violation of the licensing requirement and prohibits collection of any fees or charges associated with "contracts of loan" made in unknowing violation of the requirement. Thus, the next question is whether the term sheet agreement can be construed as a "contract of loan" under section 2215(c)(1).
The LLA does not define "contract of loan." The Vermont Supreme Court briefly addressed the meaning of "loan" under the LLA in Green Tree, 163 Vt. at 633, 660 A.2d at 299, which involved a transfer of equity agreement. The Court defined "loan" as "the creation of debt by the lender's payment of or agreement to pay money to the debtor or a third party for the account of a debtor." Id., 163 Vt. at 633, 660 A.2d 296 (citing Black's Law Dictionary 844 (5th ed.1979)). The Court refused to find the transfer of equity agreement constituted a loan covered by the LLA because the agreement did not involve the creation of new debt. Id.
In contrast to the situation in Green Tree, the parties here clearly intended to create a loan within the definition outlined in Green Tree, that is new debt for Gorman created by Marcon's payment of money to Gorman at closing. The term sheet agreement contained all the details of a financing agreement, including the amounts to be loaned, the financing conditions, and the additional charges and fees that Gorman would be required to cover.
Marcon argues that the term sheet agreement is not a "contract of loan" because it created no obligation for Marcon to provide Gorman any funding. In essence Marcon argues that the term sheet agreement is not a loan, which is undisputed.
However, section 2215(c)(1) voids "contracts of loan" not merely "loans" or "loan contracts." Given the underlying consumer protection policy of the LLA and its broad prohibition against engaging in the business of making loans, it would be reasonable to interpret "contract of loan" as enveloping a broader category of agreements between lenders and borrowers, including binding preliminary agreements. See Sagar v. Warren Selectboard, 170 Vt. 167, 171-172, 744 A.2d 422, 426 (1999)(in interpreting statutory terms, the Court will look to the whole statute, including "its subject matter, the effect and consequences, and the reason and spirit of the law"); In re A.C., 144 Vt. 37, 42, 470 A.2d 1191, 1194 (1984) ("[i]n cases dealing with statutory construction, the primary objective is to give effect to the intent of the legislature, . . . and if it can be fairly done, we will construe the statute to accomplish the purpose for which it was intended.") (citation omitted). In some situations, preliminary agreements create firm binding commitments on behalf of the parties and may be barely distinguishable from the final closing document. See Bixler v. Bullard, 172 Vt. 53, 769 A.2d 690, 694-96 (2001) (noting that preliminary agreements range from firm binding commitments to agreements creating no binding effect).
Nevertheless, even if section 2215(c)(1) makes binding lender-borrower agreements beyond loans unenforceable, in this case it is clear that the term sheet agreement did not create any obligation on the part of Marcon to loan money. As Marcon points out, the language above the signature line states that the term sheet agreement was to be used "only as a basis for continued discussions . . . and does not constitute an agreement . . . or an offer to enter into an agreement . . . and shall not *360 be deemed to obligate [Marcon] in any manner whatsoever." Term Sheet Agreement at 8. Accordingly, the term sheet agreement is not a "contract of loan" void under section 2215(c)(1).
However, even if the term sheet agreement between Marcon and Gorman was not within the section 2215(c)(1) penalty provision, it may be unenforceable under Vermont's common law prohibition against enforcement of illegal contracts. In Vermont, "[a] contract whose formation or performance is illegal may be held void and unenforceable." My Sister's Place v. City of Burlington, 139 Vt. 602, 613, 433 A.2d 275, 282 (1981). Vermont courts will not find a contract "illegal and void as being against public policy unless it [can] be said that [it] is injurious to the interests of the public or contravenes some established interest of society." State v. Barnett, 110 Vt. 221, 232, 3 A.2d 521, 526 (1939); accord Maska U.S., Inc. v. Kansa General Ins. Co., 198 F.3d 74, 80 (2d Cir.1999).
A federal court sitting in diversity must look to state law to determine what a state's public policy is or should be. Kirkpatrick v. Merit Behavioral Care Corp., 128 F.Supp.2d 186 (D.Vt.2000) (citing Maska, 198 F.3d at 80). "A public policy against the enforcement of promises or other terms may be derived by the court from (a) legislation relevant to such policy. . . ." Restatement (Second) of Contracts § 179(a)(1981); accord MacDonald v. Roderick, 158 Vt. 1, 7, 603 A.2d 369, 372 (1992). The Legislature has provided a clear statement of the public policy at issue in this case  state regulation of lenders to protect consumers from unfair and unconscionable lending practices. Vt. Stat. Ann. tit. 8, § 1 (Lexis Supp.2001).
In determining whether to refuse enforcement of a contract on public policy grounds, Vermont courts follow the weighing process set out in the Restatement (Second) of Contracts. MacDonald, 158 Vt. at 7, 603 A.2d 369. The Restatement provides that "[a] promise . . . is unenforceable on grounds of public policy if . . . the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms." § 178(1). Factors favoring non-enforcement include the strength of the public policy at issue, the likelihood that the policy will be furthered by refusing to enforce it, the seriousness or deliberativeness of the violative conduct, and the "directness of the connection between that misconduct and the term" of the contract to be enforced. MacDonald, 158 Vt. at 7, 603 A.2d 369 (citing Restatement (Second) of Contracts § 178(3)(1981)). Vermont courts have also emphasized the extent to which the violation taints the agreement or makes its enforcement unfair or prejudicial to the complaining party. MacDonald v. Roderick, 158 Vt. 1, 7 603 A.2d 369, 372 (1992); accord Robitaille v. Rubin, 159 Vt. 152, 154, 615 A.2d 1025, 1026 (1992). Factors in favor of enforcement include the parties' justified expectations, the forfeiture produced by non-enforcement, and any special public interest in favor of enforcement. Restatement (Second) of Contracts § 178(2).
A determination under this weighing process of whether the term sheet agreement should be enforced must await factual development at trial. Summary judgment on the enforceability of the term sheet agreement under Vermont common law is not appropriate at this time.
C. Marcon's Motion for Summary Judgment
Marcon has moved for summary judgment in its breach of contract claim and on Gorman's affirmative defenses. *361 This motion is denied as to Marcon's breach of contract claim for the following reasons. First, as discussed above, the term sheet agreement was made in violation of the LLA. The Court cannot determine at this stage whether it is enforceable.
Second, there is a dispute of fact as to whether the inclusion of a lockbox provision in the closing documents materially altered the financing arrangement agreed to in the term sheet agreement. Gorman contends that the provision is predatory and constitutes a material change to the term sheet agreement which contemplated UCC-patterned collateral provisions. Marcon claims that the "lockbox" provision is a standard provision in financing agreements. The Court has not even been provided with the text of this provision.
This dispute creates a genuine issue of material fact with regard to Marcon's contract claim because the $15,000 break-up fee is available to Marcon only "[i]n the event that [Marcon] is prepared to close the purchase of the Debentures under the terms and conditions as set forth herein,. . . ." Term Sheet Agreement ¶ 18. A term creating a material and unnecessary[7] alteration would prohibit an award of this fee.
Finally, the parties dispute whether Gorman arranged alternative financing. The $15,000 break-up fee is available only if Gorman refused to close because he had found alternative funding. Term Sheet Agreement ¶ 18.
As to Gorman's affirmative defenses, Gorman claims Marcon committed a prior breach of contract or failed to perform by waiting to include the lockbox provision until the last minute when Gorman would have no choice but to submit to the unfavorable term. Every contract contains an implied covenant of good faith and fair dealing by which "each party promises not to do anything to undermine or destroy the other's rights to receive the benefits of the agreement." Carmichael v. Adirondack Bottled Gas Corp. of Vt., 161 Vt. 200, 208, 635 A.2d 1211, 1216 (1993). Whether a party acted in bad faith is ordinarily a question of fact, id., 161 Vt. at 209, 635 A.2d at 1217, and thus should not be decided at summary judgment.
Gorman also raises the defense of fraud. Marcon argues that Gorman has failed to identify any misrepresentations that were material to the contemplated transaction. In his opposition to the summary judgment motion, Gorman alleges two affirmative misrepresentations of material fact. Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 19 (Paper 58). Gorman alleges that Marcon stated that the final agreement would be in accordance with the provisions of the term sheet agreement and that the term sheet agreement would serve as a basis for further negotiations, while at the same time intending to include the materially-altering lockbox provision.
Gorman also makes two claims of fraudulent nondisclosure: that Marcon intended to mislead him when it failed to disclose that the transaction would be illegal under the LLA and when it failed to disclose that it planned to include a predatory lockbox provision in the final agreement. Under Vermont law, if Marcon had a duty to disclose, "the failure to disclose [ ] material fact[s] coupled with an intention to mislead or defraud rises to the level of material misrepresentation." Sugarline Assocs. v. Alpen Assocs., 155 Vt. 437, 444, 586 A.2d 1115, 1120. The duty to disclose "aris[es] from the relations of the parties, *362 such as that of trust or confidence, or superior knowledge or means of knowledge." Silva v. Stevens, 156 Vt. 94, 103 589 A.2d 852, 857 (1991). This duty may arise even in an arms-length transaction between sophisticated business people. White v. Pepin, 151 Vt. 413, 417, 561 A.2d 94, 98 (1989). At this stage, a rational jury could find that Marcon had a duty to disclose these facts and that the alleged fraudulent misrepresentations and non-disclosures were material to Gorman's decision to enter into the term sheet agreement. Accordingly, Marcon is not entitled to summary judgment on Gorman's affirmative defense of fraud.
With regard to Gorman's remaining affirmative defenses: failure to state a claim on which relief may be granted, lack of consideration, failure to mitigate, assumption of the risk, and duress, the Court grants Marcon's motion for summary judgment. The Court has already ruled that the term sheet agreement did not lack consideration. Oral Order dated July 2, 1999. For this reason Gorman's defense of failure to state a claim also fails. There is no issue of mitigation of damages because the fees and expenses Marcon seeks were incurred prior to Gorman's alleged breach and the break-up fee represents a liquidated damages provision. Finally, Gorman does not dispute Marcon's motion for summary judgment on the assumption of risk and duress defenses.
IV. CONCLUSION
WHEREFORE, the Court GRANTS in part and DENIES in part Gorman's partial motion for summary judgment (Paper 50), and GRANTS in part and DENIES in part Marcon's motion for summary judgment (Paper 55).
NOTES
[1] In his motion for partial summary judgment Gorman seeks summary judgment on his claim of "improper attachment of real estate." Pl.'s Mot. for Partial Summ. J. Re: Violation of Licensed Lender Statute at 1 (Paper 50). While Gorman does not list "improper attachment of real estate" as a separate count in his complaint, he does list a breach of contract count and includes improper attachment of real estate as one of the forms of damage stemming from the breach. Gorman Complaint ¶ 59 (Paper 2, Ex. A).
[2] A debenture is "[a] debt secured only by the debtor's earning power, not by a lien on any specific asset." Black's Law Dictionary 8 (7th ed.1999). The debenture was to be "purchased pursuant to a debenture purchase agreement acceptable to MCC . . . and a five-year (5) detachable warrant . . . to purchase an undiluted thirty percent (30%) of the Common Stock of GRR for One Dollar ($1)." ¶ 3(a).
[3] In an earlier bench ruling the Court determined that the term sheet agreement did contain sufficient consideration on the part of Marcon to constitute a contract. Oral Order dated July 2, 1999.
[4] A "lockbox" provision is "[a] facility offered by a financial institution for quickly collecting and consolidating checks and other funds from a party's customers." Black's Law Dictionary 951 (7th ed.1999). The loan agreement is not in the record and so the exact terms of the provision are unavailable.
[5] A commercial loan is one in the amount of $25,000 or more. Vt. Stat. Ann. tit. 8, § 2200(2) (Lexis Supp.2000).
[6] This letter was to be signed by Gorman prior to the closing. Enright's affidavit referenced the letter as evidence that "Mr. Gorman was advised by counsel in his dealings with Marcon, and the form and content of [the letter] had been shared with Mr. Gorman's attorney." Enright Aff. ¶ 9 at 2 (Paper 53).
[7] Marcon did reserve the right to require additional collateral if it determined that the offered collateral was inadequate. Term Sheet Agreement at 8.