2004 VT 126

## Peerless Insurance Company v. Robert J. Frederick and Young Buck Enterprises, Inc.

[869 A.2d 112]

No. 03-039

Present: Amestoy, C.J.,[1] Dooley, Johnson, Skoglund and Reiber, JJ.

Opinion Filed December 23, 2004

---

[1] Chief Justice Amestoy sat for oral argument but did not participate in this decision.

*Pietro J. Lynn* and *Jennifer G. Mihalich* of *Lynn & Associates, P.C.*, Burlington, for Plaintiff-Appellee.

*John Paul Faignant* of *Miller Faignant & Behrens, P.C.*, Rutland, for Defendant-Appellant.

¶ 1. **Skoglund, J.** This action involves various insurance claims resulting from a fire that destroyed a building in which appellant, Young Buck Enterprises (Young Buck), operated the Bennington Station Restaurant. Young Buck leased the property from MacDonald & Secor Realty, Inc. (M&S). The suit began as a subrogation action between M&S's insurer, Peerless Insurance Company (Peerless), and the lessee, Young Buck. Young Buck denied liability and counterclaimed, alleging fraudulent inducement to purchase insurance, wrongful denial of insurance coverage, and insurer bad faith based on the filing of a subrogation action. Peerless eventually withdrew its subrogation claims, leaving only Young Buck's counterclaims. Peerless moved for summary judgment on all of Young Buck's claims, and the trial court granted the motion. Young Buck appeals from the trial court's decision on its claims of wrongful denial of coverage and insurer bad faith. We affirm.

¶ 2. The undisputed facts, as found by the trial court, are as follows. On February 24, 2000, a fire destroyed the property rented by Young Buck at 150 Depot Street in Bennington, Vermont. Pursuant to the lease between M&S and Young Buck, Young Buck had purchased an insurance policy through Peerless's local insurance agent, the Wills Agency. This policy, the so-called Commercial Lines Package, provided both Young Buck and M&S with commercial property, commercial general liability, flood, crime, and liquor liability insurance.

¶ 3. Another policy was purchased from Peerless that provided M&S, as the only named insured, with fire insurance.[2] In the beginning of the rental relationship, M&S paid the premiums on this fire insurance policy and then sought reimbursement from Young Buck. Eventually, Young Buck began paying the fire insurance premiums directly to the Wills Agency.

¶ 4. Young Buck was frequently dilatory in making the premium payments on the Commercial Lines policy. As a result, Peerless had sent cancelation notices to Young Buck on several occasions. Usually, Young Buck responded to these notices by making the premium payments before the cancelation date. On occasion, Young Buck did not make payment until after Peerless had canceled the policies. Prior to the fire that prompted this suit, Peerless reinstated the policies after each cancelation following Young Buck's representation that it had not sustained an intervening loss.

¶ 5. On January 31, 2000, Peerless sent a notice of cancelation to Young Buck for nonpayment of the Commercial Lines Package premium. According to the notice, the policy would be canceled effective February 17, 2000, if payment was not received by that date. On two separate occasions, the Wills Agency contacted Young Buck and reminded the company that payment was due. When Peerless did not receive payment by February 17, 2000, it canceled the Commercial Lines policy. At that time, the separate fire policy, which Young Buck was required to maintain for the benefit of M&S, was in place with all premium payments current.

¶ 6. On February 24, 2000, shortly before 9:30 a.m., a fire broke out at the Bennington Station Restaurant. As fate would have it, at

---

[2] Though the trial court found that Young Buck purchased this fire insurance policy, the evidence on this point is not clear. However, it is clear that M&S is the only named insured on this policy and, pursuant to an agreement between M&S and Young Buck reached at the time the lease was signed, Young Buck paid the premiums for this policy.

approximately the same time, one of Young Buck's employees came to the Wills Agency and dropped off a check payable to Peerless for the outstanding premium payment. Peerless declined to reinstate the canceled Commercial Lines policy, and the Wills Agency returned the check to Young Buck on February 25, 2000.

¶ 7. Peerless paid approximately $90,000 in losses to M&S pursuant to the fire insurance policy. As part of processing the claim for fire damages, Peerless hired a cause and origin expert who concluded that Young Buck's misuse of a laundry dryer was the source of the fire. Peerless also reviewed the lease between Young Buck and M&S and was advised by counsel that the lease contained no provisions precluding subrogation. Hence, Peerless initiated a subrogation action against Young Buck as a third-party tortfeasor to recover the money paid to M&S. In an amended complaint, Peerless added two contractual claims concerning insurance premiums it alleged remained due and owing under the canceled Commercial Lines policy.

¶ 8. Young Buck filed a three-count counterclaim wherein it alleged that Peerless: (1) wrongfully denied Young Buck insurance coverage under the Commercial Lines policy; (2) fraudulently induced Young Buck to purchase insurance by misrepresenting its cost; and (3) acted in bad faith by bringing a subrogation action. When, during the discovery process, Peerless learned that Young Buck was paying the premiums for M&S's fire insurance coverage directly, Peerless voluntarily dismissed its subrogation claims. The trial court granted Young Buck's motion for summary judgment on Peerless's contractual claims, so that only Young Buck's counterclaims remained.

¶ 9. Young Buck then moved for summary judgment on the narrow issue of whether, as a lessee, it was a coinsured under M&S's fire insurance policy. The court concluded that Young Buck was implicitly a coinsured under the lease agreement, which contained a mutual waiver of subrogation and required Young Buck to pay M&S's fire insurance premiums. Peerless then moved for summary judgment on Young Buck's three counterclaims, which the court granted. Young Buck appeals as to its first and third counterclaims.

¶ 10. In reviewing an order granting summary judgment, we apply the same standard of review as that applied by the trial court. *Doe v. Forrest*, 2004 VT 37, ¶ 9, 176 Vt. 476, 853 A.2d 48. Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.* In applying this standard, we give the nonmoving party the benefit of all reasonable doubts and inferences. *Id.*

¶ 11. On the question of whether Peerless wrongfully denied Young Buck insurance coverage under the Commercial Lines policy, the court found it undisputed that Peerless mailed the notice of cancelation on January 31, 2000, and then, when no premium was paid, canceled Young Buck's policy on February 17, 2000. Further, the court found that no "course of dealing" modified the policy terms or allowed Young Buck to ignore the notice of cancelation. It concluded that Young Buck could have no reasonable expectation that Peerless would reinstate the policy upon late payment simply because it had, in the past, done so upon a representation from the insured that it had not sustained any intervening losses. The court concluded that Peerless properly canceled Young Buck's coverage under the Commercial Lines policy by giving the required statutory notice, see 8 V.S.A. § 4712(a) (requiring forty-five days' notice to cancel in general, or fifteen days' notice if cancelation is for nonpayment of the premium), and by complying with policy language identical to the statutory requirement. On appeal, Young Buck presents no cogent argument concerning any alleged errors in the trial court's decision on this issue. We find no error in the court's analysis and hold that Peerless properly canceled the Commercial Lines policy and thus properly denied Young Buck coverage thereunder.

¶ 12. Having found that Young Buck was not entitled to coverage under the canceled Commercial Lines Package, the trial court concluded that Peerless was entitled to summary judgment on Young Buck's counterclaim for insurer bad faith, whether premised on tort or contractual liability. In the counterclaim, Young Buck alleges bad faith as follows:

> 20. The Plaintiff Peerless has engaged in a course of conduct whereby in situations where it insures both parties to a loss, it denies coverage to the insured it feels is responsible for the loss, pays the other insured, and then demands payment from its insured to whom it denied coverage.
>
> . . . .
>
> 22. The conduct of the Peerless Insurance Company up to this present time, and continuing during the course of this litigation constitutes both contractual

and insurance bad faith and renders the Peerless Insurance Company liable for punitive damages.

Claiming it was an insured under both the Commercial Lines policy and the fire insurance policy issued to M&S, Young Buck challenges the trial court's ruling that Peerless did not engage in bad faith by filing a subrogation action.

■ ■ ¶ 13. Vermont recognizes a claim for tortious bad faith brought by an insured against its own insurer when an insurer not only errs in denying coverage, but does so unreasonably. *Bushey v. Allstate Ins. Co.*, 164 Vt. 399, 402, 670 A.2d 807, 809 (1995). To establish a claim for bad faith, a plaintiff must show that (1) the insurer had no reasonable basis to deny the insured the benefits of the policy, and (2) the company knew or recklessly disregarded the fact that it had no reasonable basis for denying the insured's claim. *Id.* As a necessary prerequisite, however, the plaintiff and defendant must have an insured/insurer relationship by virtue of a policy. *Kirkpatrick v. Merit Behavioral Care Corp.*, 128 F. Supp. 2d 186, 191 (D. Vt. 2000).

¶ 14. Vermont also recognizes a contractual bad faith claim based on a violation of the covenant of good faith and fair dealing. "The implied covenant of good faith and fair dealing exists to ensure that parties to a contract act with 'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.'" *Carmichael v. Adirondack Bottled Gas Corp.*, 161 Vt. 200, 208, 635 A.2d 1211, 1216 (1993) (quoting Restatement (Second) of Contracts § 205 cmt. a (1981)). However, in *Carmichael*, we noted "an action for ... breach [of a covenant] is really no different from a tort action, because the duty of good faith is imposed by law and is not a contractual term that the parties are free to bargain in or out as they see fit." *Id.*

¶ 15. Whether the claim is for tortious or contractual bad faith, an insured/insurer relationship is still a prerequisite to sustain the claim. The overwhelming majority of jurisdictions follow exactly the same rule Vermont does: the duty of good faith and fair dealing "arises solely because of the presence of the insurance contract." *Greene v. Stevens Gas Serv.*, 2004 VT 67, ¶ 25, 177 Vt. 90, 858 A.2d 238; see *Lowe v. Am. Med. Int'l*, 494 So. 2d 413, 414 (Ala. 1986) ("The cause of action for the tort of bad faith refusal to pay was created to protect only the person for whose benefit the insurance payments should have been made."); *Soto v. Royal Globe Ins. Corp.*, 229 Cal. Rptr. 192, 197 (Ct. App. 1986) ("One who is not a party to the insurance contract and the

accompanying implied covenant of good faith and fair dealing may not maintain an action for breach of the covenant."); *United Fire Ins. Co. v. McClelland*, 780 P.2d 193, 198 (Nev. 1989) ("[A] wife's coverage as a dependent under her husband's health insurance policy does not give her standing to enforce her husband's contract rights for bad faith denial of health care benefits."); *Vecchiarelli v. Cont'l Ins. Co.*, 628 N.Y.S.2d 892, 893 (App. Div. 1995) (upholding the dismissal of a spouse's claim for bad faith where no contractual nexus was present); see also *Correa v. Pa. Mfrs. Ass'n Ins. Co.*, 618 F. Supp. 915, 929 (D. Del. 1985) (finding that the duty of good faith and fair dealing does not extend to the spouse of someone insured under a workers' compensation policy); *Transp. Ins. Co. v. Archer*, 832 S.W.2d 403, 405 (Tex. App. 1992) (disallowing a spouse's suit for bad faith when her husband was denied benefit payments from his workers' compensation carrier).

■ ¶ 16. Here, the trial court concluded that because Peerless properly canceled the Commercial Lines policy prior to the fire, Young Buck lacked the necessary insured/insurer relationship with Peerless and thus could not sustain a bad faith claim under that policy. The court further held as a matter of law that, "[l]ike Young Buck's insurer bad faith claim, the existence of an insurer/insured relationship, in this case a contract, is a necessary prerequisite to a contractual bad faith claim. . . . Thus, for the same reasons that are fatal to the claim for tortious bad faith, the absence of any contractual relationship dooms Young Buck's claim for contractual bad faith." We agree.

■ ¶ 17. However, Young Buck also argues that, even if the Commercial Lines policy no longer provided coverage when the fire occurred, Young Buck can still bring a bad faith claim against Peerless for initiating the subrogation action against an additional insured or coinsured under M&S's fire insurance. The trial court noted that Young Buck's status as a coinsured had limited effect on the claims remaining in the case after Peerless dismissed its subrogation cause of action. Further, it found that Young Buck could establish no set of facts to support its claim of bad faith arising from Peerless's election to initiate the subrogation action. The court held that Peerless had made a reasonable inquiry regarding the factual and legal foundation of its subrogation claim prior to filing suit. Noting that, at the time of its decision, the legal doctrine of "implied co-insurance" was unsettled in Vermont, the court concluded that there was "no evidence that Peerless acted in such a recklessly unreasonable way as to support a bad

faith claim." We agree that the evidence did not support a claim of bad faith against Peerless, and, therefore, that the trial court properly dismissed Young Buck's bad faith claim.

*Affirmed.*

