Argued and submitted May 2, judgment on claim for failure to defend reversed; judgment on claim for failure to indemnify reversed and remanded August 31, 2005, petition for review allowed February 21, 2006 (340 Or 157)

Krystal HOLLOWAY,
*Appellant,*

*v.*

REPUBLIC INDEMNITY COMPANY
OF AMERICA,
*Respondent.*

02-02323-CV; A123072

119 P3d 239

Donald E. Oliver argued the cause for appellant. On the briefs were Karen E. Duncan and Oliver & Duncan.

Bernard S. Moore argued the cause for respondent. With him on the brief were Frohnmayer, Deatherage, Pratt, Jamieson, Clarke & Moore, P.C. and Paul J. Killion, Banch T. Abegaze, Michael J. Dickman, and Hancock Rothert & Bunshoft.

Before Armstrong, Presiding Judge, and Brewer, Chief Judge, and Landau, Judge.*

ARMSTRONG, P. J.

---

\* Landau, J., *vice* Richardson, S. J.

## ARMSTRONG, P. J.

Plaintiff appeals from a summary judgment in defendant's favor in an action arising from plaintiff's claims of sexual harassment against defendant's insured, Loree's Chalet Restaurant. Plaintiff initially had brought an action against the insured, asserting claims for sexual harassment, constructive discharge, and intentional infliction of emotional distress (IIED). The insured tendered its defense to defendant under the insurance policy that it had with defendant. Defendant refused to defend or indemnify its insured in the action. Consequently, the insured entered into a settlement agreement with plaintiff, in which the parties stipulated to the entry of a $50,000 judgment against the insured. The parties also agreed that plaintiff would enter a satisfaction of that judgment and would covenant not to execute the judgment against the insured in exchange for $6,000 and an assignment of all the insured's rights under its policy with defendant. With that assignment in hand, plaintiff brought this action against defendant for breach of its duties to defend and indemnify the insured. In granting defendant's motion for summary judgment and denying plaintiff's cross-motion, the trial court concluded that defendant had no duty to defend or indemnify the insured in the underlying action because of two coverage exclusions in the relevant policy. We reverse on the failure to defend claim and reverse and remand on the failure to indemnify claim.

Plaintiff's complaint in the underlying action against defendant's insured alleged as follows. Defendant's insured hired plaintiff to work as a waitress. At the time, plaintiff was 16 years old. Shortly thereafter, the insured hired Zullig as a bartender and manager. Zullig immediately began directing "lewd and vulgar comments" and "unwelcome sexual advances and physical contact" at plaintiff. Zullig also "obtained plaintiff's home telephone number from her employment files * * * and began harassing her at home." Zullig entered "plaintiff's house in a drunken state on more than one occasion, refused to leave when asked, kissed [plaintiff] against her will and told her he intended to have sexual intercourse with her whether she wanted to or not."

Plaintiff reported Zullig's actions to the insured on more than one occasion, but the harassment did not cease. According to plaintiff's underlying complaint, Zullig's acts "were known to, authorized and ratified by" the insured. After approximately one month of working with Zullig, plaintiff was forced to quit because her "working environment became intolerable * * * and she feared for her safety."

As noted above, plaintiff, through her guardian ad litem because she was a minor at that time, brought an action against the insured asserting three enumerated claims: employment discrimination (sexual harassment), constructive discharge, and IIED. Counsel for the insured sent a letter to defendant, notifying it of plaintiff's claims and requesting that defendant defend and indemnify the insured under the terms of the insurance policy. Defendant never responded to that request and, in its answer in this case, admits that it effectively denied the insured coverage and defense.

The insured eventually spent approximately $5,000 defending plaintiff's action against it. Ultimately, the insured and plaintiff reached the settlement agreement described above, wherein the insured assigned its rights under the policy to plaintiff.

Plaintiff, as the assignee of the insured, then brought this contract action against defendant asserting two claims: breach of the duty to defend and breach of the duty to indemnify. The parties filed cross-motions for summary judgment. In support of its motion, defendant made two arguments. First, based on certain coverage exclusions in its policy with the insured, defendant argued that it had no duty to defend or to indemnify its insured against plaintiff's claims in the underlying action. Second, it argued that plaintiff had acquired no rights against it as a result of the assignment from the insured. In a letter opinion, the trial court agreed with defendant that the coverage exclusions applied and, therefore, granted defendant's motion and denied plaintiff's. The trial court did not address defendant's argument that plaintiff had acquired no enforceable rights as a result of the assignment.

■     On appeal, plaintiff assigns error to the trial court's grant of defendant's motion for summary judgment and to

the denial of its motion. We review the evidence to determine whether there are any issues of material fact and, if there are not, which party is entitled to judgment as a matter of law. *Powell v. Bunn*, 185 Or App 334, 338, 59 P3d 559 (2002), *rev den*, 336 Or 60 (2003).

■     Although the trial court did not address the question, we begin with the validity of the insured's assignment of rights. Defendant makes a two-pronged attack on that purported assignment. First, it argues that certain provisions in the relevant insurance policy render the assignment ineffective. Second, defendant argues that, under *Stubblefield v. St. Paul Fire & Marine*, 267 Or 397, 517 P2d 262 (1973), and its progeny, plaintiff's covenant not to execute the stipulated judgment against the insured effectively insulated defendant from any liability.

To support its first argument challenging the validity of the assignment, defendant points to three provisions of the policy that, it insists, preclude the transfer of any enforceable rights to plaintiff. The first provision states that the insured's "rights or duties under this policy may not be transferred without [defendant's] written consent." The second and third provisions relate to the insured's duties under the policy. The former provides that "[t]here will be no right of action against [defendant] under this insurance unless * * * [the insured has] complied with all the terms of this policy; and * * * [t]he amount [the insured] owe[s] has been determined with [defendant's] consent or by actual trial and final judgment." The latter prohibits the insured from "voluntarily mak[ing] payments, assum[ing] obligations or incur[ring] expenses."

Plaintiff argues that, under *Jaloff v. United Auto Indemnity Exch.*, 121 Or 187, 253 P 883 (1927), defendant waived those policy provisions by refusing to defend the insured in the underlying action. Plaintiff is correct with respect to the second and third provisions, which concern the duties of the insured. In *Jaloff*—which, contrary to defendant's position, has not been "effectively * * * overruled"— the Supreme Court held that, when an insurer refuses to defend an action, it waives policy provisions requiring the

amount of the loss to be determined after a trial and prohibiting the insured from settling claims without the insurer's consent. 121 Or at 196-200. The second and third provisions identified above are of the same sort as those at issue in *Jaloff*, and we conclude that defendant waived those provisions by refusing to defend its insured in the underlying action.

However, the first policy provision identified above— the anti-assignment provision—is not of the same sort as those at issue in *Jaloff*, and we conclude that such a provision is not waived by a failure to defend. That is because, logically, an anti-assignment provision does not have the same nexus to the duty to defend that the provisions at issue in *Jaloff* have. Thus, defendant's failure to defend its insured did not waive the anti-assignment provision. We therefore must determine whether, properly interpreted, that provision renders the assignment invalid.

We recently described the analytical framework for interpreting insurance policies this way:

> "We first determine whether the policy defined the term at issue and, if it did not, we look to the plain meaning of the term. * * * If we determine that there are two or more plausible interpretations of the term, then we consider whether those interpretations withstand scrutiny, *i.e.*, continue to be reasonable, after the interpretations are examined in the light of, among other things, the particular context in which that term is used in the policy and the broader context of the policy as a whole. * * * Only if more than one interpretation remains reasonable after such an examination will we conclude that the policy provision is ambiguous. * * * If the provision is ambiguous, we construe it against the insurer as its drafter."

*Clinical Research Institute v. Kemper Ins. Co.*, 191 Or App 595, 600, 84 P3d 147 (2004) (internal citations and quotation marks omitted). Again, the insurance policy at issue in this case provides that the "rights or duties under this policy may not be transferred without [defendant's] written consent." Nothing in the policy states what "rights or duties" may not be "transferred." The "rights or duties" could refer to pre-loss rights or duties, post-loss rights or duties, or both. We must choose among those understandings.

If the provision prohibits the assignment of pre-loss rights or duties, then it would "protect the insurer against increased risks of loss resulting from an assignment of coverage to a new insured." *Conrad Brothers v. John Deere Ins. Co.*, 640 NW2d 231, 237 (Iowa 2001). The insurer has bargained to accept the risk presented by the particular insured with whom it has contracted, and it makes sense for the insurer to seek to protect itself from the unknown risks to which an assignee insured might expose it. However, it would also be reasonable for the policy to insulate the insured from exposure to claims for indemnification from third-party claimants after a loss has occurred. The context of the policy provides little guidance, and, on the whole, it would be reasonable to read the provision to apply to either pre-loss or post-loss rights and duties, or both. In short, the provision is ambiguous.

Because the provision is ambiguous, we construe it against its drafter and conclude that it prohibits only the assignment of pre-loss rights and duties. Our conclusion is consistent with what appears to be the majority rule. *See, e.g., Conrad Brothers*, 640 NW2d at 236-38 (citing cases); *Insurance*, 44 Am Jur 2d 102 § 801 (2003) ("In the absence of an express provision to the contrary, provisions relating to the consent of the insurer to an assignment do not relate to assignments after loss or to assignments as collateral security." (Footnotes omitted.)). *But see High-Tech-Enterprises, Inc. v. Gen. Accident Ins. Co.*, 430 Pa Super 605, 635 A2d 639 (1993) (holding that assignment of insured's rights to coverage for property damage under automobile insurance policy to automobile repairer was invalid because of anti-assignment provision). Consequently, nothing in the policy affects the validity or effectiveness of the assignment, and we reject defendant's argument on that point.

In its second argument challenging the validity of the assignment, defendant argues that, under *Stubblefield* and its progeny, the covenant not to execute against the insured insulates defendant from any liability to plaintiff. At the outset, we conclude that, with regard to the claim for breach of the duty to defend, this argument must fail because *Stubblefield* and its progeny apply only to an assignment of

the duty to indemnify. Thus, we turn to *Stubblefield*'s effect on the assignment of the duty to indemnify.

In *Stubblefield*, an insured had assigned to a claimant the insured's rights to indemnification under an insurance policy. In exchange for that assignment, the claimant had agreed not to execute the $50,000 stipulated judgment against the insured for any amount in excess of $5,000. The assignment assigned the insured's rights against the insurer only to the extent that they exceeded $5,000. The Supreme Court held that, because the insurer was liable to the insured only for the amount that the insured was legally obligated to pay, and because the covenant not to execute the judgment in an amount exceeding $5,000 extinguished the insured's liability beyond $5,000, the plaintiff had acquired no enforceable rights by the terms of the assignment. *Stubblefield*, 267 Or at 400-01. Defendant argues that this case is on all fours with *Stubblefield*.

Plaintiff, on the other hand, argues that *Stubblefield* and its progeny have been abrogated by ORS 31.825, which provides:

> "A defendant in a tort action against whom a judgment has been rendered may assign any cause of action that [the] defendant has against the defendant's insurer as a result of the judgment to the plaintiff in whose favor the judgment has been entered. That assignment and any release or covenant given for the assignment shall not extinguish the cause of action against the insurer unless the assignment specifically so provides."

Defendant responds that the statute applies only to assignments that are executed *after* a judgment has been entered and that, because the assignment in this case was executed *before* the judgment was entered, ORS 31.825 does not apply and the rule from *Stubblefield* survives.

We do not believe it prudent at this time to address the effects of *Stubblefield* and ORS 31.825 on plaintiff's ability to enforce defendant's duty to indemnify. As noted above, the trial court did not address the question of the assignment's validity. Furthermore, even if defendant's argument is correct, defendant would not be entitled to summary judgment on plaintiff's claim for indemnification. Under the

terms of the assignment and covenant, the insured in this case was legally liable to plaintiff for $6,000, and the assignment to plaintiff was of "*any and all* sums of money now due or owing to [the insured]" from defendant. (Emphasis added.) In that way, the assignment in this case is distinguishable from the assignment in *Stubblefield*. Because the insured effectively assigned to plaintiff its rights against defendant for the $6,000 that the insured actually spent to settle plaintiff's claims, even if the rule in *Stubblefield* applies, defendant is potentially liable to plaintiff for up to $6,000 on the indemnification claim. As explained below, remand is necessary to determine the extent, if any, of defendant's liability on that claim. It is possible that on remand it will be determined that defendant did not breach the duty to indemnify at all, in which case it will not be necessary to address the applicability of *Stubblefield*. For those reasons, we do not address whether *Stubblefield* applies and turn to the question whether the trial court erred in concluding that defendant had no duty to defend or to indemnify.

The insurance policy at issue covers damages for an employee's bodily injuries by accident or disease that arise out of and in the course of the employee's employment by the insured. However, the policy includes a number of exclusions from coverage, two of which are at issue here. Those two provisions exclude from coverage injury or damages that are intentionally caused or that arise out of harassment and termination. Exclusion C5 provides:

"This insurance does not cover * * * bodily injury intentionally caused or aggravated by [the insured]."

Exclusion C7 provides:

"This insurance does not cover * * * damages arising out of * * * harassment * * * or termination of any employee[.]"

Defendant argues that the policy does not provide coverage for plaintiff's damages because they were either caused by intentional acts or arose out of harassment and termination.

Because the duty to defend is independent of the duty to indemnify, and the test for the breach of the former is different from the test for the breach of the latter, we address each duty separately. *See Northwest Pump v. American*

*States Ins. Co.*, 144 Or App 222, 227, 925 P2d 1241 (1996) ("The duty to defend is triggered by the bare allegations of a pleading. In contrast, the duty to indemnify is established by proof of actual facts demonstrating a right to coverage."). We start with the duty to defend.

■■ "Whether an insurer has a duty to defend an action against its insured depends on two documents: the complaint and the insurance policy." *Ledford v. Gutoski*, 319 Or 397, 399, 877 P2d 80 (1994). The Supreme Court articulated the appropriate analysis in *Abrams v. General Star Indemnity Co.*, 335 Or 392, 399-400, 67 P3d 931 (2003):

> "First, the court must determine whether the complaint contains allegations of *covered* conduct. If it does, * * * then the insurer has a duty to defend, even if the complaint also includes allegations of excluded conduct. If the complaint does not contain allegations of covered conduct, * * * then the insurer has no duty to defend."

(Emphasis in original.) In other words, "[a]n insurer has a duty to defend if the factual allegations of the complaint, without amendment, state a claim for any [conduct] covered by the policy." *Marleau v. Truck Insurance Exchange*, 333 Or 82, 91, 37 P3d 148 (2001). Importantly, the analysis focuses on the *allegations* in the complaint rather than the claims identified in it; "neither the failure to identify correctly the claims nor the failure to state them separately defeats the duty to defend." *Id*.

Again, defendant argues that the three claims asserted here—sexual harassment, constructive discharge, and IIED—are not covered because the damages were either caused intentionally or arose out of harassment and termination. As explained below, we conclude that the exclusion for damages arising out of harassment and termination—exclusion C7—applies to all three claims, and therefore do not address whether the intentional acts exclusion applies to any or all of the claims.

For convenience, we again quote the relevant text of exclusion C7, the harassment and termination exclusion:

> "This insurance does not cover * * * damages arising out of * * * harassment * * * or termination of any employee[.]"

The applicability of that exclusion turns on the meaning of the terms "arising out of," "harassment," and "termination." We therefore interpret those terms under the framework from *Clinical Research Institute* described above, looking first to see if the terms are defined in the policy and then, if necessary, searching for their ordinary meanings. Neither "arising out of," nor "harassment," nor "termination" is defined in the policy; thus, we look for their ordinary meanings.

In *Clinical Research Institute* we concluded, also in the context of a coverage exclusion, that "[t]he ordinary meaning of the words 'arising out of' is very broad" and that they "connote[ ] a causal connection with [their] subject and a concomitant broadening in the scope of the subject." 191 Or App at 601. We conclude that that understanding applies here.

The ordinary meaning of "harassment" requires a little more analysis. *Webster's Third New Int'l. Dictionary* 1031 (unabridged ed 2002) defines "harass" as

> "1 a : to lay waste (as an enemy's country) : RAID, HARRY * * * b : to worry and impede by repeated attacks * * * 2 a : to tire out (as with physical or mental effort) : EXHAUST, FATIGUE * * * b : to vex, trouble, or annoy continually or chronically (as with anxieties, burdens, or misfortune) : PLAGUE, BEDEVIL, BADGER."

It defines "harassment" as "the act or an instance of harassing" or "the condition of being harassed." *Id.* Thus, "harassment" ordinarily, but not always, connotes repetitive conduct.

*Black's Law Dictionary* provides a more insightful definition of harassment in the context of an employer's liability insurance policy (where the notion of laying waste to an enemy's country seems a bit foreign). *Black's Law Dictionary* defines "harassment" as

> "[w]ords, conduct, or action (usu. repeated or persistent) that, being directed at a specific person, annoys, alarms, or causes substantial emotional distress in that person and serves no legitimate purpose."

*Black's Law Dictionary* 733 (8th ed 2004). That definition confirms that repetition is usually, but not necessarily, an aspect of harassment. In some circumstances, a single instance of conduct can suffice, if the conduct is *severe. Cf.* OAR 839-005-0030(1)(B)(b) (rule promulgated by the Bureau of Labor and Industries defining sexual harassment to include "[a]ny unwelcome verbal or physical conduct that is sufficiently *severe or pervasive* to have the purpose or effect of unreasonably interfering with work performance or creating a hostile, intimidating or offensive working environment" (emphasis added)).

Those sources lead us to conclude that the ordinary meaning of "harassment," in the context of this insurance policy, includes either severe or repeated words, conduct, or action that, being directed at a specific person, annoys, alarms, or causes substantial emotional distress in that person and serves no legitimate purpose.

The final relevant term is "termination." To "terminate" can be understood to mean "to end formally and definitely." *Webster's* at 2359. Exclusion C7 excludes coverage for damages arising out of "termination of any employee." The prepositional phrase "of any employee" suggests that the termination results from an act of the employer, rather than an act by the employee. Thus, termination, as used in this policy, is best understood to refer to the literal and definite end of the employee's employment, brought about by an act of the employer.

With those three understandings in mind, we turn to the identified claims. Plaintiff's first claim for sexual harassment is not covered by the policy because it alleges damages arising out of harassment. The underlying complaint alleges that plaintiff was subjected to "lewd and vulgar comments," "unwelcome sexual advances and physical contact," and "a pattern of verbal sexual comments and innuendos designed to annoy, harass, intimidate and demean plaintiff, including explicit sexual and abusive language." Furthermore, the complaint alleges that those actions "created a hostile, sexually harassing environment which disrupted plaintiff's emotional tranquility in her workplace and interfered with and undermined plaintiff's personal sense of well being." We conclude that the claim for damages for sexual harassment

arises from events fitting the ordinary meaning of the term "harassment" discussed above. Thus, the insurance policy between defendant and the insured does not cover damages arising from those events. The trial court properly concluded that defendant had no duty to defend the sexual harassment claim.

The claim for damages for constructive discharge arises out of the termination of plaintiff's employment with the insured and is therefore also excluded from coverage. The allegations in that claim include that plaintiff's "working environment became intolerable for plaintiff and she feared for her safety" and that, as a result, she was forced to quit her job. Without question, the damages for the constructive discharge claim arise out of the literal and definite end, brought about by the acts of the employer, of plaintiff's employment with the insured. Therefore, they are excluded from coverage by exclusion C7. Thus, the trial court did not err in holding that defendant had no duty to defend the constructive discharge claim.

Nor did the trial court err in holding that defendant had no duty to defend plaintiff's claim for IIED. To prove her claim for IIED, plaintiff would have had to prove that the conduct that caused her emotional distress "constituted an extraordinary transgression of the bounds of socially tolerable conduct." *Harris v. Pameco Corp.*, 170 Or App 164, 170, 12 P3d 524 (2000). Plaintiff, in fact, alleged that the conduct was "beyond the reasonable limits of acceptable social conduct." Furthermore, all of the conduct that she alleged was sexual in nature. Even though plaintiff only needed to prove one instance of outrageous conduct to prove her IIED claim, because the conduct was outrageous, it necessarily also falls within the ordinary meaning of harassment as described above. That is, the outrageous conduct alleged in the complaint is the type of *severe* conduct that, even in a single instance, constitutes harassment. Thus, defendant had no duty to defend the IIED claim.

Plaintiff argues that, because exclusion C7 does not expressly apply to damages for bodily injury, her damages resulting from bodily injury arising out of harassment and termination are not excluded. Plaintiff's argument on this

point overlooks the fact that the only damages covered by the policy as a whole are damages for bodily injuries.[1] Thus, the fact that exclusion C7 does not expressly refer to bodily injuries is of no import. There is no other type of covered damage that the provision could exclude.

Plaintiff also argues that the provision does not apply to damages arising from vicarious liability. Plaintiff argues that the complaint alleges that the insured was vicariously liable for the conduct of Zullig, and therefore the exclusion does not apply. However, the exclusion applies to damages "arising out of" harassment and termination. As discussed above, "arising out of" broadens the scope of its subject, and we conclude that the provision is broad enough to exclude from coverage damages for which the insured is only vicariously liable.

However, our inquiry as to whether defendant had a duty to defend its insured is not limited to analyzing the identified claims. As explained above, a defendant has a duty to defend if allegations in the complaint state a covered claim, even if the claim stated by those allegations is not correctly identified or stated separately.

Plaintiff correctly points out that her complaint states a claim for battery. To plead a claim for battery, a plaintiff must allege that "the conduct which brings about the harm [was] an act of volition on the actor's part, and [that] the actor * * * intended to bring about a harmful or offensive contact or put the other party in apprehension thereof." *Bakker v. Baza'r, Inc.*, 275 Or 245, 249, 551 P2d 1269 (1976). A plaintiff must also allege that the actor intended the contact to be harmful or offensive. *See Cook v. Kinzua Pine Mills Co. et al*, 207 Or 34, 48-49, 293 P2d 717 (1956) (explaining that the actor must intend to "injure," that is, to violate "a protected right of the one assaulted").

Here, plaintiff alleged that, in engaging in the conduct alleged in the sexual harassment claim, "Zullig intended to place plaintiff in apprehension of an offensive contact with her person" and that "[a]s a result of * * * Zullig's [conduct],

---

[1] As discussed above, the policy states that "[t]his employers liability insurance applies to *bodily injury* by accident or *bodily injury* by disease." (Emphasis added.)

plaintiff was, in fact, placed in great apprehension of an offensive contact with her person." Plaintiff further alleged that, in engaging in the conduct alleged in the sexual harassment claim, "Zullig acted with the intent to make contact and did make contact with plaintiff's person" and that "the acts herein alleged were specifically intended to cause her severe emotional distress." Finally, plaintiff's allegation that Zullig's acts were "known to, authorized and ratified by" the insured amounts to an allegation that the insured was vicariously liable for Zullig's actions.

Within the scope of those allegations, plaintiff could have introduced evidence that established a covered claim for battery. For example, plaintiff could have introduced evidence that the insured authorized Zullig to give plaintiff a suggestive back rub at work in order to cause her emotional distress and that, as a result of that back rub, plaintiff suffered bodily injuries, such as the "physical pain and suffering" that she alleged. Such a back rub would be an intentional act that Zullig intended to cause offensive contact and, thus, would constitute a battery against plaintiff. The insured would be vicariously liable for the damages that resulted because it authorized the conduct.

Furthermore, the damages for bodily injuries from that battery would be covered by the policy. First, they amount to bodily injuries to the insured's employee arising out of and in the course of employment because they occurred at insured's place of business. Secondly, the damages for bodily injury would not be excluded by either the intentional acts exclusion in exclusion C5 or the harassment and termination exclusion in C7. Although exclusion C5 excludes coverage for bodily injuries intentionally caused by the insured, on the above fact pattern, the insured intended, at most, to cause emotional distress.

Defendant argues that, because plaintiff alleged that the "conduct [of the insured and Zullig] was intentional and voluntary" and that the insured and Zullig "knew that their actions would cause severe physical, emotional, and psychological distress and injury to plaintiff," the intentional acts exclusion applies. However, an "exclusion from coverage for intentional acts depends on the *subjective* intent of the

insured." *Klamath Pacific Corp. v. Reliance Ins. Co.*, 152 Or App 738, 740, 955 P2d 340 (1998) (citing *Allstate Ins. Co. v. Stone*, 319 Or 275, 278, 876 P2d 313 (1994)) (emphasis in original). Furthermore, "[i]t is not sufficient that the insured's intentional, albeit unlawful, acts have resulted in unintended harm; the acts must have been committed for the purpose of inflicting the injury and harm before * * * a policy provision excluding intentional harm applies * * *." *Nielsen v. St. Paul Companies*, 283 Or 277, 281, 583 P2d 545 (1978). That the insured and Zullig intended to cause emotional distress does not mean that they intended to cause bodily harm, and that they knew that bodily harm would result is not sufficient to trigger the exclusion. *Klamath Pacific Corp.*, 152 Or App at 741. Thus, the intentional acts exclusion does not apply.

Nor does the harassment exclusion in exclusion C7 apply. If plaintiff were able to prove only a single back rub, albeit one that was intended to be offensive, such conduct would not necessarily be either repeated or severe, and thus would not necessarily fall within the ordinary meaning of harassment. An isolated incident such as the one hypothesized above would not result in damages arising out of harassment, and thus would not be excluded from coverage.

Consequently, we conclude that the complaint, without amendment, stated a claim for battery that was covered by the policy and defendant, therefore, had a duty to defend its insured in the underlying action. The trial court erred in entering summary judgment for defendant on plaintiff's claim for breach of the duty to defend, and also erred in denying plaintiff's motion for summary judgment on that claim. As a matter of law, plaintiff was entitled to summary judgment on her claim for breach of the duty to defend.

We turn to the duty to indemnify. As noted above, the test for whether an insurer has breached its duty to indemnify is different from that for whether it breached the duty to defend. This court established in *Northwest Pump*, though not without dissent, that "the duty to indemnify is established by proof of actual facts demonstrating a right to coverage." 144 Or App at 227.

Like this case, *Northwest Pump* was a coverage dispute implicating both the duty to defend and the duty to indemnify. In that case, although we held that, based on sufficient allegations in the underlying complaint, the defendant had breached its duty to defend, we further held that the case had to be remanded to proceed on the merits as to whether facts could be proved that established that the third-party plaintiff's damages were caused by an event covered by the policy. We explained that the defendant was "entitled to assert the applicability of the exclusion provision. If the provision applies, it is not liable for the settlement cost. If not, then it will be liable for those settlement costs to the extent that they are reasonable." *Id.* at 230. *Northwest Pump* controls the disposition of the indemnification claim in this case.[2]

Here, both parties attached essentially the same exhibits to their motions for summary judgment: copies of the underlying complaint, the stipulated judgment, the assignment of the insured's rights, plaintiff's covenant not to enforce the judgment against the insured, and the satisfaction of the judgment. All that those documents indicate is that the judgment for $50,000 against the insured was part of a settlement for all "alleged claims." Neither party attached affidavits or exhibits that would establish one way or the other the facts of the underlying event for which there may or may not be coverage triggering the duty to indemnify. Thus, there is an issue of material fact as to whether the actual facts could establish a right to coverage and neither party is entitled to judgment as a matter of law. Under *Northwest Pump*, we must remand the claim for breach of the duty to indemnify because the trial court erred in granting summary judgment to defendant (although it correctly denied plaintiff's summary judgment motion) on that claim.

Judgment on claim for failure to defend reversed; judgment on claim for failure to indemnify reversed and remanded.

---

[2] Plaintiff argues that, if defendant breached the duty to defend, then it should be liable for the reasonable costs of the settlement. Plaintiff's argument echoes the dissenting opinion in *Northwest Pump. See* 144 Or App at 231-36 (Leeson, J., dissenting). Whatever the merits of the theory that the settlement costs should be viewed as damages stemming from the breach of the duty to defend, the majority of this court rejected that theory in *Northwest Pump. See id.* at 228-29.