**R.L. VALLEE, INC., Plaintiff,**

v.

**AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY, Defendant.**

**No. 2:05 CV 131.**

United States District Court, D. Vermont.

May 17, 2006.

Matthew S. Borick Downs, Rachlin, Martin PLLC, Burlington, VT, and Bruce Calvert Palmer, St. Johnsbury, VT, for Plaintiff.

Julie Selesnick, Richard W. Bryan, Jackson & Campbell, P.C., Washington, DC, and Peter B. Joslin, Theriault & Joslin, Montpelier, VT, for Defendant.

### *ORDER*

MURTHA, District Judge.

The Magistrate Judge's Report and Recommendation ("R & R") was filed March 16, 2006. (Paper 33.) A Ruling on Motion for Reconsideration ("Ruling") was filed April 14, 2006. (Paper 38.) After *de novo* review and over objection, the Report and Recommendation and Ruling are both AFFIRMED, APPROVED and ADOPTED. *See* 28 U.S.C. § 636(b)(1).

The Ruling has addressed the defendant's concerns in relation to the Court's inquiry on a Rule 12(b)(6) motion. Furthermore, *Greene v. Stevens Gas Serv.*, 177 Vt. 90, 858 A.2d 238 (2004) makes clear that a breach of insurance contract claim cannot be recast to support a claim under Vermont's Consumer Fraud Act. *See id.* at 97, 858 A.2d 238 ("a mere breach of contract cannot be sufficient to show consumer fraud").

Defendant's motion to dismiss plaintiff's Vermont Consumer Fraud Act claim (Count Five of Complaint) is GRANTED. Defendant's motion to dismiss the remaining claims is DENIED.

This matter is returned to the Magistrate Judge for further proceedings.

SO ORDERED.

### *MAGISTRATE JUDGE'S REPORT & RECOMMENDATION*

(Document 7)

NIEDERMEIER, United States Magistrate Judge.

Plaintiff R.L. Vallee, Inc. ("Vallee"), for itself and as assignee of MacIntyre Fuels, Inc. ("MFI"), filed this diversity action against American International Specialty Lines Insurance Company ("AISLIC"). Vallee alleges that AISLIC breached an insurance policy with MFI by denying coverage and failing to offer a defense to MFI in a state court action alleging pollution damage. The case is currently before this Court on AISLIC's motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6).

For the following reasons, I recommend that AISLIC's motion be GRANTED in part and DENIED in part.

*BACKGROUND*

For the purposes of this motion, the following facts are taken as true.

MFI is a Vermont corporation whose majority stockholders are Roch and Joy MacIntyre ("MacIntyres"). (Doc. 1–3, ¶ 6). MFI leased and operated a gasoline station in New Haven, Vermont on property owned by the MacIntyres. (*Id.* at ¶ 9). In 1992, MFI removed four underground gasoline storage tanks ("UST") and replaced them with above ground storage tanks ("AST"). (Doc. 1, ¶¶ 13, 15). MFI also installed new underground piping running from the ASTs to the pump islands. (*Id.* at ¶ 15). Griffin International, Inc. ("Griffin"), an environmental consultant retained by MFI, reported that there had been a petroleum leak from the USTs that required removing 110 cubic yards of contaminated soil. (*Id.* at ¶ 14). Even after the removal, there was residual contamination at the site. (*Id.* at ¶ 17). From 1992 through 1995, MFI and Griffin continued to work to remedy the UST contamination. (*Id.* at ¶ 18).

On June 30, 1995, MFI and the MacIntyres sold the station with all improvements to Vallee. (*Id.* at ¶ 19). Even after the sale, MFI was responsible for monitoring, conducting investigations and removing residual UST contamination to the satisfaction of the Vermont Department of Environmental Conservation, Waste Management Division, Site Management Section ("SMS"). (*Id.* at ¶ 20).

MFI is the named insured on a Contractor's Pollution Liability Policy ("Policy") issued by AISLIC. (*Id.* at ¶ 6). The Policy was in effect from April 30, 1998 until April 30, 1999. (*Id.*)

On August 17, 1998, Vallee pressure tested the AST system and discovered leaks in the piping. (*Id.* at ¶ 22). These leaks were repaired on August 19, 1998 but the contamination had already spread into the soils and groundwater of the station as well as the property and groundwater of third parties. (*Id.* at ¶ 25). According to SMS, MFI was the primary responsible party for the contamination from the AST piping leaks. (*Id.* at ¶ 27).

"By summer or early fall 2002, MFI ceased operations and turned all material assets over to secured creditors." (*Id.*) Hence, MFI was "insolvent and thereafter lacked the ability to proceed with additional work at the Site or to satisfy any resulting liabilities." (*Id.*) By October 2002, MFI "refused to accept further responsibility for clean up at the Site and abandoned further work at the Site." (*Id.* at ¶ 28). Therefore, SMS then looked to Vallee to complete the remediation of the station. (*Id.* at ¶ 29).

On November 21, 2002, Vallee sued MFI, Griffin, and the MacIntyres individually in Vermont state court. (*Id.* at ¶ 32). Vallee sought to recover actual damages and costs for the petroleum contamination and breach of contract, future remediation costs, and an injunction ordering the defendants to prevent and correct any continuing petroleum contamination. (Doc. 1–3, Page 9–10). MFI requested a defense and indemnification from AISLIC. (Doc. 1, ¶ 34). AISLIC's claims representative and handling agent AIG Technical Services, Inc. ("AIG") investigated the claim. (*Id.* at ¶ 35). On May 15, 2003, AIG denied coverage for the claim. (*Id.* at ¶ 37; Doc. 1–4, Pages 4–6). AIG denied coverage under the Policy because (1) the gas station was not a "job site", (2) supervising Griffin's work was not a "covered operation" and fell under Exclusion N, and (3) the contamination history had not been reported to AISLIC and fell under Exclusion A. (Doc. 1–4, Pages 4–6).

MFI lacked the resources to defend the suit or to pursue a separate action to secure coverage from AISLIC. (Doc. 1, ¶ 41). Based on its estimate of the past

and future costs of remediating the AST and UST contamination, Vallee proposed a $1.5 million settlement. (*Id.* at ¶¶ 44–47). On August 5, 2004, MFI forwarded the proposed settlement to AISLIC indicating that it would "finalize a settlement . . . only if AISLIC would not acknowledge its responsibilities to MFI and take over the defense . . . and pay any damages." (*Id.* at ¶ 48, 50). On August 17, 2004, AISLIC affirmed its denial of coverage for the claim. (*Id.* at ¶ 51).

MFI and Vallee agreed to a stipulated judgment and dismissal of all claims against the MacIntyres. (*Id.* at ¶ 52). As part of the settlement, MFI assigned to Vallee "all insurance rights and proceeds pertinent to the settlement, including rights to defense or indemnity dollars and to all other claims against AISLIC." (*Id.* at ¶ 53).

On May 16, 2005, Vallee brought this action against AISLIC alleging in seven counts that AISLIC: (1) breached its duty to defend MFI, (2) breached its duty to indemnify MFI, (3) breached its contractual duty of good faith and fair dealing to MFI, (4) breached its fiduciary duty to MFI, (5) violated the Vermont Consumer Fraud Act ("VCFA"), Vt. Stat. Ann. tit. 9, §§ 2451–2480, (6) acted willfully, maliciously and/or with reckless or wanton indifference entitling Vallee to punitive damages, and (7) acted negligently.

## DISCUSSION

AISLIC has moved to dismiss Vallee's complaint under Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction and Fed.R.Civ.P. 12(b)(6) for failure to state a claim. AISLIC argues that this Court lacks jurisdiction because under 28 U.S.C. § 1332(c) there is no diversity. AISLIC further argues that (1) the assignment of MFI's rights to Vallee violated the Policy and is invalid, (2) Vallee cannot maintain a direct action, (3) Vallee's claim is not cov-

ered by the Policy, (4) Vallee cannot assert bad faith claims because there is no coverage under the Policy and Vallee is not a party to the Policy, and (5) the VCFA does not apply to insurance transactions.

### I. Standard of Review

On a motion to dismiss under either Rule 12(b)(1) or 12(b)(6), the Court reads the plaintiff's complaint with generosity. *See Jaghory v. New York State Dept. of Educ.*, 131 F.3d 326, 329 (2d Cir.1997). Taking the allegations in the complaint as true, the court must construe the complaint in the light most favorable to the plaintiff, and draw all inferences in plaintiff's favor. *Id.* The complaint must not be dismissed unless " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995) (quoting *Walker v. City of New York,* 974 F.2d 293, 298 (2d Cir.1992)). Indeed, there is an important "difference between disposing of a case on a 12(b)(6) motion and resolving the case later in the proceedings, for example by summary judgment." *Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims." *Id.* (citations and internal quotation marks omitted).

### II. Subject Matter Jurisdiction

Vallee has alleged that this Court has original jurisdiction of this action pursuant to 28 U.S.C. § 1332, which requires diversity of citizenship between the parties and an amount in controversy exceeding $75,000.

According to the diversity statute, "in any direct action against the insurer of a policy or contract of liability insurance . . .

to which action the insured is not joined as a party-defendant, such insurer shall be deemed a citizen of the State of which the insured is a citizen." 28 U.S.C. § 1332(c). AISLIC argues that this suit is a direct action and therefore AISLIC must be deemed a citizen of Vermont. AISLIC contends that since its insured MFI is also a citizen of Vermont, this Court lacks diversity jurisdiction.

As used in the statute, a direct action refers to "those cases in which a party suffering injuries or damage for which another is legally responsible is entitled to bring suit against the other's liability insurer without joining the insured or first obtaining a judgment against him." *Rosa v. Allstate Ins. Co.*, 981 F.2d 669, 675 (2d Cir.1992). Hence, for the purposes of § 1332(c), a direct action is based on liability that "could be imposed against the insured." *Id.* "[T]he general rule is that the proviso [§ 1332(c)] does not affect suits against the insurer based on its independent wrongs: such as actions brought against the insurer either by the insured for failure to pay policy benefits or by an injured third party for the insurer's failure to settle within policy limits or in good faith." *Id.* In this case, Vallee is asserting claims based on the alleged wrongdoing of AISLIC, namely, that AISLIC has breached its fiduciary duty, duty to defend, duty to indemnify, and duty of good faith and fair dealing. Therefore, this case is not a "direct action" and § 1332(c) does not apply.

Moreover, as discussed more fully below, Vallee is the assignee of MFI's claims and therefore stands in MFI's shoes. This Court has previously decided that a suit brought by the insured against his own insurer is not a direct action. *Woodstock Resort Corp. v. Scottsdale Ins. Co.*, 921 F.Supp. 1202, 1204 (D.Vt.1995).

Therefore, AISLIC should be deemed to be a citizen of New Jersey where it has its principal place of business. Accordingly, there is diversity between the parties and AISLIC's motion to dismiss for lack of subject matter jurisdiction should be denied.

### III. *Assignment*

AISLIC has also moved to dismiss for failure to state a claim. First, AISLIC argues that Vallee cannot assert MFI's rights because the assignment violates the Policy's anti-assignment clause.

The anti-assignment clause states: "[t]his Policy shall not be assigned without the prior written consent of the Company. Assignment of interest under this Policy shall not bind the Company until its consent is endorsed onto this Policy." (Doc. 1–2, Page 16). AISLIC argues that the assignment from MFI to Vallee is invalid because AISLIC did not consent. Vallee argues that an assignment of rights after the covered loss occurs does not violate the anti-assignment clause.

The Vermont Supreme Court has not addressed whether a post-loss assignment violates the anti-assignment clause of an insurance policy. When state law is not clear, this Court must predict how the highest court would rule. "In making this prediction, we give the 'fullest weight' to pronouncements of the … Vermont Supreme Court, while giving 'proper regard' to relevant rulings of the state's lower courts." *Maska U.S., Inc. v. Kansa General Ins. Co.*, 198 F.3d 74, 78 (2d Cir.1999) (quoting *Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir.1994)). This Court may also consider "decisions in other jurisdictions on the same or analogous issues." *Id.* (quoting *Leon's Bakery, Inc. v. Grinnell Corp.*, 990 F.2d 44, 48 (2d Cir.1993)).

*Wolfe v. Lexington Ins. Co., Inc.*, Docket No. S–277–87 WnC (Wash.Super.Ct., December 10, 1991) (Doc. 11–4) directly addresses this issue. In that case, the insur-

er argued that it was not liable to the plaintiff, the injured party, because of the non-assignment provision of the policy. The court rejected this argument noting that "it is a basic tenet of insurance law that: ... 'once the loss has occurred and the rights under the policy have accrued, the assignment may be made without the consent of the insurer, even though the policy prohibits such assignment. Under such circumstances, the assignment of a right under the policy is not regarded as a transfer of the policy itself, but rather of a chose in action.'" *Id.* at ¶ 73 (quoting 6B Appleman, *Insurance Law and Practice,* § 4269). This decision is consistent with the majority rule developed in many states that an anti-assignment clause "is valid with respect to transfers that were made prior to, but not after, the insured-against loss has occurred." *Globecon Group, LLC v. Hartford Insurance Co.,* 434 F.3d 165, 171 (2d Cir.2006); *See e.g. Conrad Brothers v. John Deere Ins. Co.,* 640 N.W.2d 231, 237 (Iowa 2001) (noting the weight of authority supporting same rule and citing to cases from Wisconsin, Pennsylvania, Michigan, Texas, North Carolina, Delaware, Missouri, Arizona, Florida, Illinois, New Jersey, Washington, and West Virginia); *Antal's Restaurant, Inc. v. Lumbermen's Mutual Casualty Co.,* 680 A.2d 1386, 1388 (D.C.1996) (citing cases from Alabama, Maine, Wisconsin, California, Georgia, Illinois and New York).

The reasoning behind the development of this rule is premised on the nature of the contract. An insurer "has bargained to accept the risk presented by the particular insured with whom it has contracted." *Holloway v. Republic Indemnity Co. of America,* 201 Or.App. 376, 119 P.3d 239, 244 (2005). The insurer's exposure to risk is altered if the insured assigns the policy to another before there is a covered loss. Hence, this rule protects the insurer's interest in insulating itself from unforeseen risk. However, once the loss occurs, the insurer is obligated to cover the loss agreed to under the terms of the policy. This obligation is not altered when the claimant is not the party who was originally insured. "[T]he accrual of an insurance claim extinguishes the insurer's interest in the risk profile of the insured, thereby converting the claim into, in effect, a chose in action." *Globecon,* 434 F.3d at 171. Hence, after the loss occurs there is no additional risk to the insurance company if the insured assigns its right to any claims or proceeds under the policy to another. *See id.* (quoting *Northern Ins. Co. of N.Y. v. Allied Mutual Ins. Co.,* 955 F.2d 1353, 1358 (9th Cir.1992)). After the loss, the anti-assignment clause serves only to limit the free assignability of claims, which is not favored by the law. *Antal's Restaurant,* 680 A.2d at 1388.

Given the weight of the authority and its reasoning, I recommend finding that the assignment of rights from MFI to Vallee is valid, and the anti-assignment clause of the Policy is unenforceable, because MFI assigned its rights under the Policy to Vallee after the covered loss occurred.

## IV. *Direct Action*

AISLIC also argues that Vallee's claims under Vermont's Direct Action statute should be dismissed because (1) Vallee has not properly alleged that MFI is insolvent, and (2) the claims are not covered by the Policy.

Vermont's Direct Action statute mandates that "[t]he insolvency or bankruptcy of the insured shall not release the company from the payment of damages for injury sustained or loss occasioned during the life of the policy ..." Vt. Stat. Ann. tit. 8 § 4203(3). Hence, when the insured is insolvent or bankrupt, the injured party may bring suit against the insurer "under the terms of the policy, for the amount of any judgment obtained against the insured not exceeding the limits of the policy." *Id.*

### A. Insolvent

■ AISLIC argues that Vallee has not sufficiently alleged that MFI is insolvent. AISLIC has focused on Vallee's allegations that MFI is "unable to pay a judgment to Vallee in the Lawsuit from assets other than insurance without insolvency." (Doc. 1, ¶ 39). AISLIC argues that this statement is too speculative.

"Insolvent" is not defined in the statute. The plain and ordinary meaning is "having liabilities that exceed the value of assets" or "having stopped paying debts in the ordinary course of business." *Black's Law Dictionary* 812 (8th ed.2004); *See also The American Heritage Dictionary of the English Language* (4th ed. 2000) ("Unable to meet debts or discharge liabilities.") available at http://dictionary. reference.com. Under Vermont law, "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets." Vt. Stat. Ann. tit. 9, § 2286. The Vermont Uniform Commercial Code states that "a person is 'insolvent' who either has ceased to pay his debts in the ordinary course of business or cannot pay his debts as they become due or is insolvent within the meaning of the federal bankruptcy law." Vt. Stat. Ann. tit. 9A, § 1–201. The U.S. Bankruptcy code defines insolvency as a "financial condition such that the sum of such entity's debts is greater than all of such entity's [non-excludable] property." 11 U.S.C. § 101(32).

Vallee has alleged that "[b]y summer or early fall 2002, MFI ceased operations and turned all material assets over to secured creditors, became insolvent and thereafter lacked the ability to proceed with additional work at the Site or to satisfy any resulting liabilities." (*Id.* at ¶ 27). Reading the complaint with generosity with the above definitions in mind, Vallee has sufficiently alleged that MFI had no remaining assets.

Accepting Vallee's allegations as true, as this Court must under Rule 12(b)(6), Vallee's direct action claim should not be dismissed.

### B. Coverage

AISLIC also argues that Vallee cannot maintain a direct action because there is no coverage under the Policy. As discussed in detail below, Vallee has presented claims that are potentially covered under the Policy. Therefore, Vallee's direct action against AISLIC should not be dismissed at this early stage of the proceedings.

### V. *Duties to Defend and Indemnify*

Vallee has alleged that AISLIC breached both its duty to defend and to indemnify MFI in connection with Vallee's claim for damages from the leaks in the underground piping. AISLIC argues that it had no duty to defend or indemnify MFI in the state court action because the alleged claims were not covered by the Policy.

### A. Waiver

Vallee argues that AISLIC has waived its coverage defenses because it wrongfully refused to defend the claim.

In *Orleans Village v. Union Mutual Fire Insurance Co.*, 133 Vt. 217, 219, 335 A.2d 315 (1975), the Vermont Supreme Court held that "Where a liability insurer refuses to defend an insured after timely notice, the judgment in the prior case 'is binding upon the insurer as to issues which were or might have been litigated therein....'" However, this decision does not address the present situation where there has been no prior coverage determination. When faced with a stipulated settlement in *The Woods at Killington Owners' Assoc. v. Ins. Co. Of N. America*, Docket No. S1868–982CnC, at 5–6 (Chittenden Super. Ct. Aug. 3, 1995) (Doc. 11–6), the court similarly distinguished *Orleans* and then

proceeded to determine whether there was coverage under the policy. There is no indication that the defendant insurance company was barred from arguing that issue. The decision in *Wolfe v. Lexington Ins. Co., Inc.*, Docket No. S–277–87 WnC (Washington Super. Ct. Dec. 10, 1991) (Doc. 11–5), is not to the contrary. In that case, the court addressed the issue of whether an insurer who wrongfully refused to defend can contest the settlement between the injured party and the insured. The court reasoned that when "the court later rules insurer has the obligation to defend and unjustifiably failed to do so, the insurer is on the hook for the amount of the settlement, so long as the settlement is fair and reasonable." *Id.* at 38. This statement does not address whether the insurer is estopped from raising policy defenses when contesting its duty to defend.

■ Under Vermont law, "when an insurer elects to specify reasons for denying coverage it thereafter waives all other available grounds for denying coverage unless it expressly reserves the right to later raise other grounds." *Hardwick Recy-*

*cling & Salvage, Inc. v. Acadia Ins. Co.*, 177 Vt. 421, 427, 869 A.2d 82 (2004); *City of Burlington v. Hartford Steam Boiler Inspection and Ins. Co.*, 190 F.Supp.2d 663 (D.Vt.2002); *Cummings v. Connecticut General Life Ins. Co.*, 102 Vt. 351, 148 A. 484 (1930). In *Hardwick*, the court reviewed the trial court's decision that insurer did not have a duty to defend because there was no coverage under the policy. In addressing the waiver question, the court found that the insurer could not waive policy defenses that it "had no way of knowing were necessary and available." 177 Vt. at 430, 869 A.2d 82. Therefore, the court approved the underlying decision to allow two new defenses despite a previous order excluding the insurer's affirmative defenses not raised in its denial letter. The court proceeded to evaluate these coverage defenses and concluded that third party claims against the insured triggered the insurer's duty to defend. Hence, by implication, the insurer who refused to defend its insured and expressly reserved its rights did not waive policy defenses in an action to determine the insurer's duty to defend.[1]

1. Other states have directly addressed this question. Some have found that a breach of the duty to defend effects a waiver. *See Maneikis v. St. Paul Ins. Co. Of Illinois*, 655 F.2d 818, 821 (7th Cir.1981) ("Once an insurer violates its duty to defend, it is estopped to deny policy coverage in a subsequent lawsuit by the insured or the insured's assignee."); *State Farm Fire & Cas. Co. v. Ruiz*, 36 F.Supp.2d 1308, 1318 (D.N.M.1999) ("[B]ecause State Farm unjustifiably refused to defend its insured, it will not be heard to complain that the claims might not have been within the coverage." (citation omitted)); *Anderson v. Virginia Sur. Co., Inc.*, 985 F.Supp. 182, 189 (D.Me.1998) ("[A] wrongful failure to defend an insured results in the insurer's waiver of the right to litigate the indemnification issue." (citation omitted)). Other states have refused to find a waiver. *See e.g. Spencer v. Assurance Co. Of America*, 39 F.3d 1146, 1149 (11th Cir.1994) ("Florida law clearly states that liability of an insurer

depends upon whether the insured's claim is within the coverage of the policy. This remains true even when the insurer has unjustifiably failed to defend its insured in the underlying action." (citation omitted)); *Peterborough Oil Co., Inc. v. Great American Ins. Co.*, 397 F.Supp.2d 230, 243–244 (D.Mass. 2005) ("if the insurer fails to defend the lawsuit, it is liable for all defense costs and (assuming policy coverage) the entire resulting judgment or settlement, unless liability can be allocated among covered and uncovered claims." (citation omitted)); *Servants of Paraclete, Inc. v. Great American Ins. Co.*, 866 F.Supp. 1560, 1577 (D.N.M.1994) (affirming lower court holding that insurer was not estopped from arguing that plaintiff's liability to third party was not covered by the policy); *Moore v. State Farm Mutual Auto. Ins. Co.*, 196 Ga.App. 755, 397 S.E.2d 127, 129 (1990) (finding that insurer's wrongful denial of a defense "constitutes its waiver of the opportunity to contest [insured's] negligence.

As discussed more fully below, this Court finds that Vallee's claims were potentially covered by the policy, thereby triggering AISLIC's duty to defend. Therefore, this Court need not decide whether AISLIC waived its coverage defenses by refusing to defend the state court action.

### B. Duty to Defend

■ The insurer's duty to defend[2] is triggered when the complaint against the insured alleges claims that fall within the coverage provided by the policy. *City of Burlington, Vermont v. Arthur J. Gallagher & Co.*, 944 F.Supp. 333, 336 (D.Vt. 1996). However, "the duty to defend is broader than the duty to indemnify" such that "as long as there exists a possibility that a claim falls within the coverage of an insurance policy, the insurer has a duty to provide a defense for the insured." *Vermont Gas Systems, Inc. v. U.S. Fidelity & Guar. Co.*, 805 F.Supp. 227, 231 (D.Vt. 1992). This requires a court to "look[ ] to the known facts underlying a plaintiff's complaint to understand the application of policy provisions or exclusions." *Garneau v. Curtis & Bedell, Inc.*, 158 Vt. 363, 366, 610 A.2d 132 (1992).

To determine whether AISLIC had a duty to defend Vallee's claims against MFI, this Court must first determine whether Vallee alleged any claims in the state court complaint that might be covered by MFI's Policy.

### C. Coverage

■ Vermont law mandates that the duty to indemnify is determined according to the intent of the parties as evidenced by the language of the policy. *Garneau*, 158 Vt. at 367, 610 A.2d 132; *Whitney v. Nationwide Mut. Ins. Co.*, 151 Vt. 510, 511, 562 A.2d 467 (1989). Accordingly, policy language is given its "plain and ordinary meaning." *American Protection Ins. Co. v. McMahan*, 151 Vt. 520, 522–23, 562 A.2d 462 (1989). Any ambiguities are resolved in favor of the insured. *Peerless Ins. Co. v. Wells*, 154 Vt. 491, 494, 580 A.2d 485 (1990). Moreover, policy terms "should be interpreted consistent with the purpose of providing coverage, therefore, limitations and exclusions should be strictly construed." *Gerrish Corp. v. Universal Underwriters Ins. Co.*, 754 F.Supp. 358, 366 (D.Vt.1990).

According to the Policy, "[t]he Company will pay on behalf of the Insured all sums that the Insured shall become legally obligated to pay as Loss as a result of Claims for Bodily Injury, Property Damage, or Environmental Damage caused by Pollution Conditions resulting from Covered Operations." (Doc. 1–2 at 4). "Covered Operations" are defined as "physical operations and activities designated in the Declarations which are performed by or on behalf of the Named Insured at a job site." (*Id.* at 9). The Declarations page identifies "UST/AST removal/installation, masonry, electrical, non-hazardous excavation, general construction, paving and canopy installation" as the Covered Operations. (*Id.* at 1).

### 1. Underground Piping

AISLIC argues that the Policy does not cover the contamination from the under-

---

It does not, however, constitute a waiver of its right to deny coverage."); *Alabama Hosp. Ass'n Trust v. Mutual Assur. Soc. of Alabama*, 538 So.2d 1209, 1216 (Ala.1989) ("A failure of an insurer to defend a claim against an insured does not work an estoppel on the issue of coverage." (citation omitted)).

**2.** It is not disputed that the Policy creates a duty to defend "when a Claim is made against the Insured to which [coverage] applies ... even if groundless, false, or fraudulent." (Doc. 1–2, Page 5).

ground piping because (1) the contamination did not take place during the policy period, (2) it falls under Exclusion A of the Policy, (3) the piping is related to the operation of a service station, which is not a "covered operation," and (4) the service station is not a "job site."

### (a) Date of Leak

■■■ In the state court complaint, Vallee claimed that MFI negligently installed the underground piping used to convey gasoline. (Doc. 1-3, ¶ 26). AISLIC characterizes this conduct as connected to the removal of the USTs. Hence, it argues that the claim is based on the UST contamination, which occurred outside of the policy period. Vallee does not contest that the UST contamination occurred outside of the coverage period or that MFI knew about the UST contamination prior to purchasing the Policy. Rather, Vallee has alleged that after removing the USTs, MFI negligently installed new underground piping that leaked gasoline, thereby creating a new and independent Pollution Condition.

Certainly, since the piping was installed in 1995, the leak occurred prior to the Policy period (April 30, 1998—April 30, 1999). However, according to the Policy, "if the date of first exposure is before the inception date of the first Contractors Pollution Liability Policy the Company issued to the Named Insured ... or can not be determined, but the progressive, indivisible Bodily Injury, Property Damage or Environmental Damage continues in fact to exist during this Policy Period, it will be deemed to have occurred only on the inception date of such first Contractors Pollution Liability Policy ..." (Doc. 1-2, Page 4-5). In this case, Vallee alleges that the new leak from the underground piping was discovered in August, 1998, which was during the policy period. (Doc. 1-4, Page 2). Hence, under the terms of the Policy this Pollution Condition would be "deemed to have occurred" on April 30, 1998, the first day of the policy period.

### (b) Exclusion A

■■■ AISLIC also argues that Exclusion A of the Policy prohibits coverage for any contamination at the site from the USTs. Exclusion A of the Policy provides: "This Policy does not provide coverage ... for: Any claim based upon or arising out of Pollution Conditions existing prior to the inception date of this Policy, if any employee of the Named Insured ... or any manager, supervisor, officer, director or partner of the Named Insured knew or reasonably could have foreseen that such Pollution Conditions could give rise to a Claim." (Doc. 1-2, page 5). Based on this exclusion, AISLIC argues that since the UST contamination was known, this related claim based on a leak in the piping was foreseeable. Again, this argument is premised on merging the leak from the new underground piping with the existing UST contamination. Although Vallee's original complaint does not lay out the exact chronology of events, the "known facts" are evidenced in part by the report prepared by AIG, AISLIC's claims representative. According to AIG's report, MFI discovered the UST contamination when it removed the USTs. (Doc. 1-4, Page 1). MFI then installed ASTs and "was authorized to install underground piping ... for the purpose of conveying gasoline." (*Id.* at 1-2). Taking Vallee's allegations as true, the contamination from the leak in the newly installed underground piping is independent of the existing contamination from the USTs and would not be barred by Exclusion A.

### (c) Covered Operations

■■■ Alternatively, AISLIC argues that the piping contamination is related to the operation of a service station, which is not

within the Policy's Covered Operations. Vallee's complaint alleges that a Pollution Condition resulted from the negligent installation of piping used to convey gasoline. Although the complaint does not use the Policy language to describe the claim, common sense and AIG's report indicate that MFI removed USTs and replaced them with ASTs. Therefore, the new underground piping "for the purpose of conveying gasoline" must run from the new ASTs. Hence, it is more reasonable to link the piping to "UST/AST removal/installation," than general service station operations. In this context, the installation of the underground piping would fall within the Policy's designated Covered Operations, provided it was installed at a job site.

(d) Job Site

■ According to the Policy, "Covered Operations" are "physical operations and activities designated in the Declarations which are performed by or on behalf of the Named Insured at a job site." (Doc. 1–2 at 9). The parties dispute whether the installation occurred at a "job site." The term "job site" is not defined by the Policy and there is no identification of any particular job sites associated with the Policy. According to its plain and ordinary meaning, a "job site" is "a location at which construction or remodeling is taking place." Webster's New Millenium Dictionary of English, Preview Edition, http://dictionary. reference. com; *See also J. Ray McDermott & Co., Inc. v. Fidelity & Casualty Co. of New York,* 466 F.Supp. 353, 362–365 (E.D.La.1979). In its letter denying coverage for the claim, AISLIC reasoned that the service station was not a job site because "the Site is the location where MFI conducted its operations in the normal course of business." (Doc. 1–4, Page 4). AISLIC now argues that "it is not possible that a service station MFI no longer owned could possibly be considered

a job site." Although AISLIC might have added the term "job site" in order to limit coverage to locations other than where the insured conducts its own business operations, "the insurer most familiar with the subject chooses the words of his undertaking, and it is not unjust to take them in the sense conveyed to the ordinary reader, or to hold against him in case of real substantial doubt." *Wolfe v. Lexington Ins. Co., Inc.,* Docket No. S–277–87 WnC, ¶ 66 (Washington Super. Ct. Dec. 10, 1991) (Doc. 11–5). Construing the term in favor of the insured and in favor of coverage, a "job site" is the location where the "UST/AST removal/installation, masonry, electrical, non-hazardous excavation, general construction, paving, and canopy installation" take place, regardless of who owns the property or benefits from the work. Taking Vallee's allegations as true under this construction of the Policy, the underground piping was installed at a job site and the contamination resulting from that allegedly negligent installation potentially fell within the Policy coverage.

2. Negligent Supervision

In the state court complaint against MFI, Vallee also claimed that MFI negligently hired and supervised Griffin, the environmental consultant. AISLIC argues that this claim is barred by Exclusions A and N of the Policy and therefore cannot trigger its duty to defend.

■ "The duty to defend is triggered if any claim against the insured potentially comes within the policy's coverage." *Atkinson v. Town of Westmore,* 38 F.Supp.2d 338, 343 (D.Vt.1999) (citing *Garneau v. Curtis & Bedell, Inc.,* 158 Vt. 363, 366, 610 A.2d 132 (1992)). Hence, once the insurer's duty to defend is triggered, the insurer must defend the entire suit including any claims that might not be covered by the policy. *See e.g. Bodewes v. Ulico*

*Cas. Co.,* 336 F.Supp.2d 263, 277 (W.D.N.Y.2004); *P.J. Noyes Co. v. Am. Motorists Ins. Co.,* 855 F.Supp. 492, 496 (D.N.H.1994); *Dilbert v. Hanover Ins. Co.,* 63 Mass.App.Ct. 327, 825 N.E.2d 1071, 1075 (2005); *Cf. Am. Guar. & Liab. Ins. Co. v. Timothy S. Keiter, P.A.,* 360 F.3d 13, 20 (1st Cir.2004) ("[U]nder Maine law, if an insurer has a duty to defend against one count of a complaint, it has a derivative duty to defend against other counts if they are sufficiently related that apportioning defense costs as between [them] is not practicable." (citation omitted)). Since this Court finds that the contamination from the piping triggered the duty to defend, it is not necessary to address the negligent supervision claim, which has not been asserted in Vallee's complaint against AISLIC.

In conclusion, Vallee's claim based on the contamination from the underground piping was a potentially viable claim under the Policy that triggered AISLIC's duty to defend. Therefore, Vallee's claims for breach of the duties to defend and indemnify should survive AISLIC's motion to dismiss.

## VI. *Bad Faith*

█ AISLIC also argues that Vallee cannot maintain either a contractual or tortious bad faith claim because it is not the insured party.

AISLIC relies on *Peerless Ins. Co. v. Frederick,* 177 Vt. 441, 446, 869 A.2d 112 (2004) for the rule that "whether the claim is for tortious or contractual bad faith, an insured/insurer relationship is still a prerequisite to sustain the claim." On its face, this is a true statement of the law. However, that court found that there was no insured/insurer relationship because the policy had been properly cancelled for failure to pay the premiums. *Id.* at 447, 869 A.2d 112. The court reasoned that "the duty of good faith and fair dealing 'arises

solely because of the presence of the insurance contract.'" *Id.* at 446, 869 A.2d 112. Moreover, the cases cited in *Peerless* all denied recovery for a spouse or family member attempting to assert a bad faith claim as a third-party or incidental beneficiary. *Id.* at 446–447, 869 A.2d 112. Accordingly, the rule that AISLIC is advancing is better understood as excluding third-party beneficiaries from the insured/insurer relationship. *See also* 22–142 Appleman on Insurance Law and Practice § 142.1 (2nd Ed.2005) ("The injured party may assert some claims the insured has against the insurer ... only if the insured assigns them to the injured party. The claims may not be asserted under a third party beneficiary theory.").

█ AISLIC does not dispute that there is a valid contract with MFI. Also, Vallee does not claim to be a third-party beneficiary of that insurance contract. Rather, Vallee is asserting claims as an assignee of MFI. AISLIC has not argued that MFI cannot assign its bad faith claims. In fact, "[W]here a judgment creditor has obtained such an assignment, he or she may pursue the insurer for alleged bad-faith refusal to defend or settle." 14 Couch on Insurance § 204:32 (3rd Ed.2005); *See also* 22–142 Appleman on Insurance Law and Practice § 142.1 (2nd ed. 2005) ("Thus, an injured party, ordinarily, is not a third party beneficiary of certain duties of the insurer ... such as duties to defend and to settle .... To be able to maintain a suit directly against the insurer for breach of those rights of the insured, the injured party must obtain an assignment of the insured's rights against the insurer."). As discussed above, the assignment between MFI and Vallee is valid. Therefore, Vallee stands in the shoes of the insured and can assert the contractual and tortious bad faith claims that MFI could have raised against AISLIC.

## VII. *Consumer Fraud*

█ AISLIC argues that Vallee's consumer fraud claims must fail because insurance transactions are not covered by the statute.

Whether the Vermont Consumer Fraud Act applies to the insurance industry is an open question. Certainly, before the VCFA was amended, insurance did not fall under the statutory definitions of "goods" or "services." *Wilder v. Aetna Life & Cas. Ins. Co.*, 140 Vt. 16, 18, 433 A.2d 309 (1981). However, the VCFA has been amended since *Wilder* and this question has not been decided under the new version of the statute. *See Greene v. Stevens Gas Service*, 177 Vt. 90, 91, 858 A.2d 238 (2004).

However, the Vermont Supreme Court has decided that even if insurance were covered by the VCFA, "a mere breach of contract cannot be sufficient to show consumer fraud." *Id.* at 97, 858 A.2d 238. In *Greene*, the court rejected the plaintiff's consumer fraud claim predicated on a denial of coverage under the policy. The court relied on decisions from other states and the fact that under this theory every denial of coverage becomes actionable consumer fraud.

In this case, like *Greene*, Vallee's allegations of consumer fraud are limited to AISLIC's denial of coverage. Therefore, without deciding whether insurance transactions are covered by the VCFA, Vallee cannot maintain its consumer fraud claim based on a coverage dispute.

## CONCLUSION

For the foregoing reasons, I recommend that this Court GRANT AISLIC's motion to dismiss Vallee's VCFA claim in Count 5

of the complaint, and DENY AISLIC's motion to dismiss the remaining claims. March 16, 2006.